**Cornwallis DEAN, II, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

No. 92–1235.

United States Court of Veterans Appeals.

Dec. 20, 1995.

450

Lisabeth Wagner, Cupertino, CA and L.N. Divinsky, San Francisco, CA, were on the pleadings for appellant.

Mary Lou Keener, General Counsel, Atlanta, GA; Norman G. Cooper, Assistant General Counsel; Andrew J. Mullen, Deputy Assistant General Counsel; and Michael P. Butler,

Washington, DC, were on the pleadings for appellee.

Before MANKIN, HOLDAWAY, and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, veteran Cornwallis Dean, II, appeals a June 30, 1992, BVA decision denying entitlement to service connection for Huntington's chorea and vascular headaches. Record (R.) at 3–9. The appellant, through counsel, has filed a brief urging reversal of the Board's decision; the Secretary has filed a motion for summary affirmance. Summary disposition is not appropriate here because the outcome of the case is reasonably debatable. *See Frankel v. Derwinski,* 1 Vet.App. 23, 25–26 (1990). By order dated May 16, 1994, the Court stayed proceedings in this appeal pending a decision in the case of *Edenfield v. Brown,* 6 Vet.App. 432. Recently, the Court issued its opinion in that case. *Edenfield v. Brown,* 8 Vet.App. 384, No. 92–1263 (Nov. 1, 1995) (en banc). For the reasons that follow, the Court will affirm the Board's decision.

## I. Background

The veteran served on active duty in the United States Army from September 1977 to September 1980. R. at 68. The report of his June 1977 pre-enlistment examination described his health as "excellent". R. at 13–16. According to service medical records (SMRs) from Madigan Army General Hospital, in February 1978 he complained of "cold × 1 h[ou]r", headache, dizziness, and coughing; the examiner diagnosed "flu syndrome". R. at 18–19. An August 1980 SMR noted a complaint of lower back pain following a fall, but the examiner noted "no neuro[logical] s[ymptoms] or physical findings". R. at 48. That same month, the veteran indicated that he did not wish to undergo a separation medical examination, and no examination was performed. R. at 47.

A February 1985 Army National Guard enlistment examination report noted no abnormalities. R. at 51–52. On an accompanying questionnaire, the veteran stated that he had suffered from "[d]izziness or fainting" and wrote: "I am [in] good condition". R. at

49. The examiner wrote: "When plays too vigorously (e.g. basketball) he gets dizzy and disoriented momentarily." R. at 50. A June 1987 National Guard SMR stated: "P[atien]t thinks he has diabetes[-]like symptoms or low blood sugar. [He] feels flushed intensity for over 2 y[ea]rs. He hasn't gained w[eigh]t & has chest pains with numb feet." R. at 55.

According to a January 1991 Department of Veterans Affairs (VA) Medical Center (MC) neurology progress note, the veteran was seen following complaints of decreased coordination and decreased exercise capacity. R. at 73. The progress note indicated that he had been seen "in triage" in December 1990, at which time "Bell's [palsy]" and a family history of Huntington's disease had been noted. (Bell's palsy is facial paralysis; Huntington's disease, also known as hereditary chorea, is "a progressive disorder usually beginning in young to middle age, consisting of a triad of choreoathetosis, dementia, and autosomal dominant inheritance with complete penetrance"; penetrance is the "frequency, expressed as a fraction or percentage, of individuals who are phenotypically affected, among persons of an appropriate genotype." STEDMAN'S MEDICAL DICTIONARY 1285, 333, 1320 (26th ed.1995) [hereinafter STEDMAN'S].) The examiner wrote:

Noted [decreased] exercise early [19]90—[decreased] ability to climb/run up hills. Tendency to fall. Notes after shower feels dizzy—like [sic] "pass out" since [19]89. After exercise has difficulty focusing vision. No actual LOC [loss of consciousness]. Double vision began 1985/86—saw [doctor.] ? Etiology[.] Diplopia esp[ecially] after exercise/excitement. Also r[ight] face "shakes" [and] l[eft] upper lip curls up under stress.—1988/87. Legs "give out" under him. Dad notes slurring of speech, ataxia—like he's intoxicated. Twitching l[eft] eye. Memory [decrease]—loses things.... When first came back from Wash[ington]—"defensive"....

R. at 73. (Diplopia is "[d]ouble vision"; ataxia is "[a]n inability to coordinate muscle activity during voluntary movement, so that smooth movements occur." STEDMAN'S at 489, 161.) In the margin, the examiner wrote: "1979—diplopia". R. at 73. The ex-

aminer stated the following diagnostic impression: "Family h[istory of] Huntington's now with relatively clear indications of disease in himself. [Positive for a]dventitious movements, difficulty ambulating, memory problems, personality [change]s". R. at 75. An undated but apparently contemporaneous entry on the back of that report noted a "h[istory] of abn[ormal] movements and [decreased] memory during past few years" and a decrease in normal movement of the right face probably due to a childhood injury. R. at 76.

In February 1991, the veteran filed with a VA regional office (RO) an application for VA disability compensation or pension, listing his disabilities as Huntington's chorea, dizziness, disorientation, and headaches. R. at 69–72. Although he stated that all of these disabilities had begun in June 1978, he indicated that he had received treatment for them in April and May 1978 at the Tacoma, Washington, Army hospital and between January 1979 and September 1980 at the Fort Lewis, Washington, Army dispensary. R. at 70. He also indicated that he had received treatment for all four claimed disabilities at the Walla Walla, Washington, VAMC between June 1982 and January 1989 and at the San Diego, California, VAMC starting in January 1991. He also gave the names and addresses of three individuals who, he asserted, had knowledge, starting in June 1978, of his having these disabilities. R. at 71.

According to a March 1991 VA neuropsychological examination report, the veteran "stated that he experienced some dizziness and headaches while in the Army, but that he was unsure if these symptoms were related to Huntington's." R. at 79. It further stated: "During the past year, he noticed fatigue, disequilibrium, dizziness and tingling in his arms.... He denied any history of head trauma or other neurological disorders." R. at 79–80. In conclusion, the two examiners stated that the veteran's neuropsychological test results were "consistent with his diagnosis of early Huntington's disease". R. at 84.

In a March 1991 VA outpatient consultation report, the examining physician stated:

The patient's major complaints are dizziness and incoordination, which he states began about 1978.... He also gets headaches. They also began in 1978 and involve the right temple and occasionally the left temple.... He was told in 1991, he says, by the VA Hospital in [San Diego] that he has Huntington's Chorea.... I do not have those records available to me and they should be gotten to confirm the diagnosis and the workup and the assuredness of the diagnosis.

R. at 88. The physician recorded impressions of "Huntington's Chorea (by history)", "Headaches, in vascular nature", and "Incoordination and dizziness, secondary to either one or other neurologic disorder to be determined". R. at 88–89.

In a May 1991 rating decision, the VARO denied service connection for, inter alia, "Huntington's chorea (also claimed as dizziness/disorientation)" and vascular headaches. R. at 98–99. In May 1991, the veteran filed a Notice of Disagreement. R. at 102. In August 1991, he testified under oath at a personal hearing at the San Diego RO that from 1978 through 1980 he had gone to the dispensary and sick-call bay many times to complain of "the dizziness and [his] headaches, and everything else" (R. at 117); that while in service he had experienced migraine headaches and high-pitched sound in his ears (ibid); that he had been "in good physical condition" and had performed vigorous workouts in service and that those workouts had become more difficult for him during service (R. at 118); and that he had run about three miles per day in service (ibid). When asked whether he had ever stumbled or fallen, he said: "My problem was coordination. My equilibrium could have been thrown off, but I was young then and played it off. I kind of brushed it aside. I didn't know what I know today." Ibid.

He further testified that while in service he had become dizzy on several occasions, recalling one time when he couldn't play football due to dizziness, disorientation, and double vision, and that he had reported that episode to the dispensary. R. at 120. He stated that he had gone to the sick bay at least 20 times for double vision and dizziness;

that military doctors had given him medication although he did not know what the medication was; and that he remembered taking much aspirin. R. at 127. He testified that he didn't understand why his SMRs did not document his symptoms because a doctor at Madigan Army General Hospital had told him that, because his mother had Huntington's disease, he had a "50/50 chance" of developing the disease, but that the doctor "didn't elaborate a lot. He didn't know.... He didn't want to tell me." R. at 122. The veteran said that when he had gone to sick bay in service "I didn't want to admit to myself that I was suffering from Huntington.... I couldn't explain the dizziness and the headaches.... I did have the symptoms." R. at 126. When asked whether his symptoms had started in service, he testified: "They increased. They might not have started in the military, but they increased." *Ibid.*

In a concluding statement, the veteran's representative stated at the hearing:

In this veteran's case, symptoms were actually present, apparently, before service, but [in] a very slight way. They were aggravated in his last year of service to where he went to sick bay over 20 times, where he became paranoid, disoriented, [and experienced] double vision.... [T]he symptoms he had definitely show that this condition was present, in fact, before service, and it was aggravated by military service.

R. at 129. The representative concluded by asking the hearing officer to "grant service connection by aggravation." R. at 130.

In an August 1991 decision, the hearing officer denied service connection for Huntington's chorea and vascular headaches. R. at 132. In an October 1991 statement, the veteran's representative acknowledged that "there were no symptoms or signs of Huntington's [c]horea documented either during, or for a significant period of time following the veteran's military service", but, the representative argued, "this void in the medical records does not present any irreconcilable inconsistency with the veteran's evidence." R. at 136–37.

In the June 30, 1992, BVA decision, here on appeal, the Board denied entitlement to service connection for Huntington's chorea and vascular headaches. At the outset of its decision, the Board found that the claims were well grounded and that "all relevant facts necessary to an equitable disposition of the appeal have been obtained". R. at 4–5. With respect to Huntington's chorea, the Board noted that SMRs documented that on two occasions in 1978 and two occasions in 1979 the veteran had been treated for influenza and viral syndrome, and that SMRs were negative for any "complaints, findings or manifestations of" Huntington's chorea. R. at 5. The Board noted that the January 1991 VA examination report recorded the veteran's statement that he had experienced double vision in 1979; that he had felt "like he was about to pass out" in 1985–86 and had other symptoms starting in 1987; that at the time of the March 1991 VA examination the veteran had reported that episodes of dizziness and lack of coordination had begun in 1978; and that at the August 1991 personal hearing he had testified that he had experienced headaches, dizziness, loss of coordination, double vision, and a memory problem in service. R. at 6.

The Board's decision stated, in relevant part:

"Huntington disease is a progressive hereditary disorder that usually appears in adult life. The symptoms usually appear between 35 and 40 years of age. However, the range of age is broad, with cases recorded as early as age 5 and as late as age 70. The three characteristic manifestations of the disease are movement disorder, personality disorder and mental deterioration. In general, the onset is insidious beginning with clumsiness, dropping of objects, fidgetiness, irritability, slovenliness and neglect of duties progressing to frank choreic movements and dementia. The disease tends to run its course over a period of 15 years, more rapidly in those with an earlier age of onset." *Merritt[']s Textbook of Neurology,* Rowland, Lewis P., Chap. 113. p. 647–650, 8th ed.

The symptoms identified above were not shown in service and were not shown by

the objective evidence of record until many years after service discharge.

R. at 7.

As to the veteran's sworn testimony that he was treated on numerous occasions in service for symptoms alleged to be consistent with Huntington's chorea, the Board found that the SMRs "do not confirm this testimony as to the number of times he was treated" and that "on those occasions where symptoms alleged to be consistent with Huntington's chorea were treated, a diagnosis of an acute disorder such as influenza or viral syndrome was noted." R. at 7. The Board found that the first diagnosis of Huntington's chorea was in January 1991, at which time the veteran had indicated that his symptoms had begun in 1985, and the Board concluded that the history the veteran had reported in January 1991 "for the purpose of receiving medical treatment is of greater probative value than the testimony at the personal hearing in August 1991[ ] and the arguments advanced for the purpose of securing disability compensation." R. at 7–8. Based on a lack of in-service findings of the disease and a lack of evidence of continuity of symptomatology between discharge and 1985, the Board concluded that the preponderance of the evidence was against the claim. R. at 8.

With respect to vascular headaches, the Board found that the SMRs did not reflect any complaints, findings, or manifestations of vascular headaches and that although the veteran had complained of headaches in 1978 and 1980 "those complaints were related to acute disorders diagnosed at that time." *Ibid.* The Board stated that the first postservice report of headaches was at the March 1991 VA examination, when the veteran had reported a history of headaches since service. The Board concluded that there was no objective evidence to relate the March 1991 diagnosis of vascular headaches to service, and denied the claim. *Ibid.*

## II. Analysis

In his pleadings, the appellant, through counsel, presents substantial arguments that the Board's decision contains numerous errors; inter alia, he argues that the Board failed to provide an adequate statement of reasons or bases for its decision as required by 38 U.S.C. § 7104(d)(1) and *Gilbert v. Derwinski,* 1 Vet.App. 49, 56–57 (1990); that the Board failed properly to apply the benefit-of-the-doubt rule as required by 38 U.S.C. § 5107(b); that the Secretary violated the provisions of 38 U.S.C. § 5107(a), the statutory duty to assist, by not seeking to obtain medical records relating to the veteran's admissions to both sick bay and Madigan General Hospital and service and medical records of his National Guard service; and that the Board's quotation of a medical-treatise definition of Huntington's chorea violated this Court's holding in *Thurber v. Brown,* 5 Vet.App. 119, 126 (1993). Brief at 4–6; Reply Brief at 2–3. The Court need not rule on these alleged errors, however, because, as set forth in part II.A., below, the Court holds that the appellant's claims were not well grounded.

### A. Well–Grounded Claim Requirement

Section 5107(a) of title 38, U.S.Code, provides in pertinent part: "[A] person who submits a claim for benefits under a law administered by the Secretary shall have the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." The Court has defined a well-grounded claim as follows: "a plausible claim, one which is meritorious on its own or capable of substantiation. Such a claim need not be conclusive but only possible to satisfy the initial burden of [section 5107(a) ]." *Murphy v. Derwinski,* 1 Vet.App. 78, 81 (1990). In addition, the Court held in *Tirpak v. Derwinski,* that to be well grounded a claim must be accompanied by supportive evidence and that such evidence "must 'justify a belief by a fair and impartial individual' that the claim is plausible." *Tirpak,* 2 Vet.App. 609, 611 (1992) (quoting section 5107(a)). Where the determinative issue involves either medical etiology or a medical diagnosis, competent medical evidence is ordinarily required to fulfill the well-grounded-claim requirement of section 5107(a); where the determinative issue (such as the recounting of symptoms) does not require medical expertise, lay testimony by itself may suffice. *See Heuer v. Brown,* 7 Vet.App. 379, 384 (1995) (citing *Grottveit v.*

*Brown*, 5 Vet.App. 91, 93 (1993)); *Magana v. Brown*, 7 Vet.App. 224, 227–28 (1994); *Espiritu v. Derwinski*, 2 Vet.App. 492, 494–95 (1992). The determination whether a claim is well grounded is a conclusion of law subject to de novo review by the Court under 38 U.S.C. § 7261(a)(1). *See Grivois v. Brown*, 6 Vet.App. 136, 139 (1994); *Grottveit, supra*.

When a claimant submits a well-grounded claim, the Secretary is required under 38 U.S.C. § 5107(a) to assist the claimant in developing the facts pertinent to the claim. *See* 38 C.F.R. § 3.159 (1994); *Littke v. Derwinski*, 1 Vet.App. 90, 91–92 (1990). The Court's jurisprudence clearly establishes that the Secretary's duty to assist under section 5107(a) does not attach until the claimant has submitted a well-grounded claim. *E.g., Caluza v. Brown*, 7 Vet.App. 498, 512–13 (1995); *Grivois*, 6 Vet.App. at 140; *Grottveit, supra*.

In the instant case, with respect to the Huntington's chorea claim, because the determinative issue involves questions of medical etiology—whether Huntington's chorea was incurred in service or, if it preexisted service, whether it was aggravated by service—"competent medical evidence to the effect that the claim is 'plausible' or 'possible' is required". *See Caluza, Grivois*, and *Grottveit*, all *supra*. Here, although the appellant has presented competent medical evidence that he *currently* suffers from Huntington's chorea, he has failed to present medical evidence linking either the onset or aggravation of that disability to his period of service. The appellant testified under oath that he had experienced headaches, dizziness, loss of coordination, double vision, and a memory problem in service. As a lay person, he is competent to testify as to the symptoms he experienced in service, but he is not competent to opine as to a link between those symptoms and his present diagnosis. *See Heuer, Magana, Grottveit*, and *Espiritu*, all *supra*.

The appellant also testified that a physician at Madigan Army General Hospital had informed him while he was in service that he had a "50/50 chance" of developing Huntington's chorea. However, the Court has held that a "layman's account, filtered as it was

through a layman's sensibilities, of what a doctor purportedly said is simply too attenuated and inherently unreliable" to constitute the medical evidence required to render a claim well grounded under *Grottveit*. *Robinette v. Brown*, 8 Vet.App. 69, 77 (1995). Furthermore, even if the physician's statement were of record—as opposed to being filtered through a lay person—it still would be insufficient to render the claim well grounded because it would be an opinion only as to the likelihood of the veteran's subsequently developing Huntington's chorea, not an opinion that the disability had its onset in, was aggravated by, or would otherwise be related to the appellant's condition in service. *Cf. Robinette*, 8 Vet.App. at 77–79 (holding that 38 U.S.C. § 5103(a) imposes obligation on Secretary to notify claimant of evidence needed to complete incomplete application for benefits and that nature and extent of duty depends on evidence submitted in support of particular claim and of which VA has notice).

Similarly, because the appellant's vascular-headache claim involves a determination of medical etiology, competent medical evidence that the claim is plausible is required. Although the February 1978 SMR entry is competent medical evidence that he had complained of headaches on one occasion in service, and although the veteran currently has a diagnosis of vascular-headache disorder, there is no medical evidence of record linking either that single headache episode specifically or the appellant's service generally to his present headache disorder. *See Heuer, Magana, Grottveit*, and *Espiritu*, all *supra*.

The Court holds that the appellant failed to submit a well-grounded claim under 38 U.S.C. § 5107(a) as to either Huntington's chorea or vascular headaches and that VA was not, therefore, required to afford him the duty to assist (*see Tirpak, supra*) or to carry his claims to full adjudication (*see Heuer, Magana, Grottveit*, and *Espiritu*, all *supra*).

Although the BVA erred in finding that the claims for service connection for Huntington's chorea and vascular headaches were well grounded, the error did not result in prejudice to the appellant. *See* 38 U.S.C.

§ 7261(b) (Court shall take due account of rule of prejudicial error); *Edenfield*, 8 Vet. App. at 390. The outcome, disallowance of the claim, would be the same whether VA had treated the claim as not well grounded or, as in this case, adjudicated it on the merits. The appropriate remedy is therefore to affirm the BVA decision as to the disallowance of these claims. *Id.* at 388–89.

### B. Asserted Adjudication Errors

In *Thurber*, the Court held:

> [B]efore the BVA relies, in rendering a decision on a claim, on any evidence developed or obtained by it subsequent to the issuance of the most recent [Statement of the Case (SOC)] or [Supplemental SOC] with respect to such claim, the BVA must provide a claimant with reasonable notice of such evidence and of the reliance proposed to be placed on it and a reasonable opportunity for the claimant to respond to it. If, in the course of developing or obtaining or attempting to so develop or obtain such evidence, the BVA becomes aware of any evidence favorable to the claimant, it shall provide the claimant with reasonable notice of and a reasonable opportunity to respond to the favorable evidence, and shall in its decision provide reasons or bases for its findings with respect to that evidence.

*Thurber*, 5 Vet.App. at 126.

■ In the present case, the record contains no evidence that the Board provided the appellant with notice of its intent to rely upon the quoted excerpt from MERRITT'S TEXTBOOK OF NEUROLOGY. The Board's material reliance in its decision upon a medical treatise to which it had not given the appellant an opportunity to respond appears to have violated, in a way that would generally be considered prejudicial, the procedural requirements set forth in *Thurber*. It also appears to have violated *Hatlestad v. Derwinski*, 3 Vet.App. 213, 217 (1992), in not providing the context for the quotation. The Court holds, however, that, because the appellant failed to submit a well-grounded claim and thus was not entitled to receive an adjudication of his claim on the merits, any Board

*Thurber* or *Hatlestad* violations were not prejudicial to him. *See* 38 U.S.C. § 7261(b); *see also White (Frank E.) v. Brown*, 6 Vet. App. 247, 252 (1994) (where claimant fails to submit new and material evidence to reopen claim under 38 U.S.C. § 5108, Board's *Thurber* error is nonprejudicial and does not require remand); *cf. Yabut*, 6 Vet.App. at 85 ("failure of the BVA to provide appellant with [*Thurber*-required] notice and an opportunity to respond to the medical treatises superfluously cited in its decision constitutes [nonprejudicial] error"). The same conclusion obtains as to any deficiencies in the Board's statement of reasons or bases, including consideration of the benefit-of-the-doubt rule. *See Soyini v. Derwinski*, 1 Vet. App. 540, 546 (1991); *see also Williams (Willie) v. Brown*, 4 Vet.App. 270, 273–74 (1993) (holding that "[i]n a case where there is significant evidence in support of an appellant's claim . . ., the Board must provide a satisfactory explanation as to why the evidence was not in equipoise" so as to require application of benefit-of-the-doubt rule).

### III. Conclusion

Upon consideration of the record and the pleadings of the parties, the Court holds that the appellant has not demonstrated that the BVA committed error that would warrant remand or reversal under 38 U.S.C. §§ 5107(a), 7252, and 7261. The Court grants the Secretary's motion for summary affirmance (except to the extent that it urges summary action), and affirms the June 30, 1992, BVA decision with respect to its disallowance of the two claims.

AFFIRMED.