**Samuel R. EVANS, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

No. 93–1220.

United States Court of Veterans Appeals.

Aug. 1, 1996.

William D. Mallard, Jr., Atlanta, GA, was on the brief, for appellant.

Mary Lou Keener, General Counsel; Norman G. Cooper, Assistant General Counsel; David W. Engel, Deputy Assistant General Counsel; and John D. Lindsay, Jr., Washington, DC, were on the brief, for appellee.

Before NEBEKER, Chief Judge, and KRAMER and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, veteran Samuel R. Evans, appeals an August 27, 1993, Board of Veterans' Appeals (BVA or Board) decision denying reopening of claims for service connection of low back and neuropsychiatric disorders, and denying an increased (compensable) rating for scars, left hand. Record (R.) at 8–16. The appellant urges the Court to reverse the Board's decision and to find that he is entitled to service connection for the neuropsychiatric and back conditions and an increased rating for left-hand scars. The Secretary proposes a remand as to the two claims to reopen and seeks affirmance on the rating-increase claim. For the reasons that follow, the Court will vacate the Board decision as to the rating-increase claim and remand that matter for further development and readjudication, and will affirm the Board decision as to the two claims to reopen.

### I. Background

The veteran served on active duty in the U.S. Army from January to September 1957. R. at 26. A November 1956 preinduction examination report indicated no abnormalities, illness, or disabilities, except for a scar on his left elbow. R. at 33–36. A service medical record (SMR) reported his complaint of pain in the lumbosacral spine after he had lifted a heavy duffel bag, and noted that there was "no previous history of back strain". R. at 45. He had complaints of back pain with "slight tenderness to palpation at L1–L2" the following month. *Ibid.*

In July 1957, his company commander referred him for a neuropsychiatric examination because he was unable to read or write and the commander believed that he did not possess "adequate intelligence to assimilate instructions and training." R. at 53–54. Pertinent history revealed longstanding episodic "fainting spells" causing unconsciousness for one to five minutes—occurring most recently about a week prior to enlistment. R. at 53. The examining psychiatrist con-

cluded that this history suggested that the veteran had "suffered from a form of petit mal epilepsy which he is apparently outgrowing". *Ibid.* The examination revealed an IQ of 77 with a mental age of approximately 11 years and "no evidence of psychosis or neurosis". *Ibid.* The report contained a diagnosis of "inadequate personality, chronic, severe" (R. at 53), and recommended that the veteran be separated from service because he could not be satisfactorily rehabilitated (R. at 54).

The veteran's SMRs also noted "multiple superficial lacerations [and] abrasions of dorsum [ (upper surface) ] of left hand" (R. at 46) due to a jeep accident in July 1957 (R. at 47). An x-ray of his left hand showed "[n]o bony abnormalities". R. at 308. Approximately ten days later, a clinical SMR reported "minimal edema and very slight limitation of motion of the ... joints of all fingers". R. at 51. (Edema is "the presence of abnormally large amounts of fluid in the inter-cellular tissue spaces of the body", DORLAND'S MEDICAL DICTIONARY 528 (28th ed.1994) [hereinafter DORLAND'S].) Two days thereafter, a clinical SMR noted that "[e]dema of dorsum, right [sic] hand has subsided and range of motion of all joints is normal." R. at 51. The veteran's September 1957 separation medical examination report noted "[f]ull range of motion", "[n]o abnormalities" with respect to "paraspinal muscles or reflexes", and "[t]aenia vesicul[a]r, moderate". R. at 23. (Taenia is "a flat band or strip of soft tissue"; vesicular is pertaining to or made up of vesicles (small saclike bodies containing liquid) on the skin, DORLAND'S at 1656, 1821, 1820.) A corresponding report of medical history included the veteran's notes of having had "swollen or painful joints", "depression or excessive worry", and "nervous trouble", and a physician's summary of "[j]eep accident [illegible] months ago—back and head hurt. Back hurt [with] lifting." R. at 60–61.

In October 1957, the veteran filed with a Veterans' Administration (now Department of Veterans Affairs) (VA) regional office (RO) a claim for, inter alia, "[i]njury, [left] [h]and ... ( [g]rip [l]oss)" and a "[b]ack [i]njury ... ( [p]ain on lying down)", both of which he asserted were from the jeep accident in Au-

gust 1957 (R. at 29; *see also* R. at 71–72); however, SMRs do not include the back as an area injured in the jeep accident. *See* R. at 46–56. A December 1957 VA medical examination report related the veteran's complaints as, inter alia: "Back hurts when lies down" and "[h]and is weak—left hand" (R. at 64), and included the following description of his musculoskeletal system:

All joints of both upper and lower extremities have full range of motion without pain. There is no tenderness, swelling, or crepitation on motion of any joints. The paravertebral muscles are not tender or spastic. He can ... squat and rise from squatting position without difficulty. There are 2 small scars, less than 1 cm in diameter on the dorsum of the left hand. The grip is good and the scars are non-adherent.

R. at 66. As to the veteran's psychiatric condition and personality, the examiner noted that the veteran "appear[ed] to have [a] low mental age[;] otherwise normal". R. at 67. The diagnosis included, inter alia, "[s]cars, two, small less than 1 cm in diameter, dorsum left hand, non-adherent, non-symptomatic, non-disabling" and "[n]o abnormality of back—no evidence of back injury found". *Ibid.*

A VA x-ray of the lumbar spine, lumbosacral region, sacrum, and major portion of the pelvis in January 1958 showed "no primary bone or joint abnormality"; "no sign of old fracture, congenital abnormalities and no sign of arthritis." R. at 361. A June 1958 VARO decision denied service connection for, inter alia, residuals of a back injury and granted a 0% rating for left-hand scars. R. at 83, 85.

In July 1958, the veteran requested that his "nervous condition be added to [his] claim for disability". R. at 91. The next month, the RO denied his claim for, inter alia, a nervous disorder, noting that the evidence of record showed a diagnosis of an "inadequate personality", which is a "[c]onstitutional or developmental abnormality" and thus "not a disability within the meaning of the law for which compensation is payable". R. at 94–95. A February 1961 medical statement from Dr. Jarrell, a private physician, stated: "Some lumbo[s]acr[a]l pain on flexion and

palpation noted, [s]cars and some weakness noted of left hand". R. at 99. The impression was, inter alia, "[l]umbo[s]acral sprain [with] [p]ossible ... arthritic changes", and "[w]eakness [in the] left hand grip". *Ibid.*

The veteran sought to reopen his claim for a back disorder by submitting a January 1977 report from a private physician, Dr. Hadden, who noted an impression of "[p]ostoperative HNP [herniated nucleus pulposus] with degeneration of L4[-]5 and S–1, mild." *Ibid.* History included the excision of a herniated disc in 1970. *Ibid.* A medical statement from Dr. Thompson, a private orthopedic surgeon, noted in May 1977:

> [The veteran] claims documented back injury in 1957 while in service. In 1962[, he] began having additional low back difficulty, eventuating in disk surgery (left L5/S1) in 1971, after several attacks.
>
> Based on retrospective reasoning, with history of back difficulty after a jeep upset in 1957, it appears that there is some service-connection of this man's low back problem.

R. at 116. A July 1977 RO decision denied reopening of his back claim. In August 1977, the veteran appealed to the BVA (R. at 109, 130) and submitted five lay statements attesting to his complaints of back pain at various times after service (R. at 124, 126, 128, 134, 136). He and his mother testified before the RO. R. at 138–49. He testified that two days after the jeep accident he had experienced back pains after lifting a duffel bag (R. at 138–39); that he again had had back pains approximately three months after being discharged (R. at 141); and that the doctor who had operated on his back had told him that "a regular x-ray couldn't determine how a back injury was" (R. at 143).

An x-ray report of his lumbosacral spine in January 1978 revealed "[m]inimal hypertrophic degenerative changes" with "narrowing of the intervertebral disc spaces at the L4–L5 and L5–S1 levels". R. at 154. The accompanying VA medical examination report (R. at 156–60) included a history of residual back injury, related the veteran's account that his back had not been treated immediately after the 1957 jeep accident, and noted continued pain after a 1970 operation

for removal of a disc (R. at 157). The examiner reported current complaints of back pain that "runs into [the veteran's] left leg". *Ibid.* The diagnosis was "[b]ack injury—history onset 1957—laminectomy 1970—scoliosis—restriction of motion ... low back syndrome". R. at 159. In a September 1978 BVA decision, the Board denied service connection for a back disability. R. at 186. The Board found that the veteran "was treated for an acute and transitory episode of low back pain in January 1957 during active service", and that "[t]here was no etiologic relationship between the herniated disc and the veteran's period of active service." R. at 186. Thereafter, in November 1978, the RO denied service connection for both the back and nervous conditions, without mentioning the issue of new and material evidence. R. at 207. A July 1979 BVA decision denied reopening of both claims. R. at 233.

A VA medical examination report in May 1980 included lumbosacral spine x-ray conclusions of "[d]egenerative changes ... worse at the level of the lower lumbar spine" and "no evidence of fracture or dislocation", and noted "[n]o change ... in comparison" to the January 1978 study. R. at 247. The report found that the veteran had a "lumbar discogenic disease", and a diagnosis of "[r]esiduals of status post laminectomy with decreased sensory changes of the left thigh", "nervous condition", and "[d]egenerative changes of lower lumbar spine". R. at 249. An accompanying VA psychiatric examination report diagnosed "[t]ension, expressed as a result of physical pain" (R. at 252), and explained that the "nervous problem consists of a feeling of tenseness, itching at times, and breaking out from time to time in red spots", with difficulty sleeping and episodes of shaking, and that the veteran had reported that "this has been the case ever since the jeep accident and the back problems in the military", (R. at 251).

The veteran again sought to reopen his back claim and submitted a February 1983 medical statement from Dr. Thompson, a private physician, and his own statement. R. at 277, 284, 286; *see* R. at 116. Dr. Thompson stated that he had reviewed the veteran's SMRs and Dr. Jarrell's 1961 medical report,

as well as the veteran's account of continued "low back discomfort", and he concluded:

> Because of the continuation of low back symptoms after the jeep accident, and in light of the further developments, there seems to be a causal relationship suggesting strongly that his low back condition had its origin in the jeep accident of 1957, starting with damage to the lumbosacral disk, leading to its deterioration.

*Ibid.* In appealing May 1982 and April 1983 RO denials of reopening, the veteran submitted December 1983 statements from G. Gerber, D.O., documenting the veteran's back pain and limited range of motion, and from Dr. Orea, a private physician, and the two prior statements from Dr. Thompson. R. at 295, 297–312; *see* R. at 317. Dr. Orea stated that he had been treating the veteran since August 1983 for a "[c]hronic [d]epressive condition, which in my opinion has probably been present since [the veteran] served in the Army in 1957, and prior to his administrative discharge from the service". R. at 298. Dr. Orea also stated:

> As far as the origin of [the veteran's] depression, it is my belief that the stress and pressures of the military life have played a major role in his depression together with a chronic back pain which has been present since he sustained a back injury on [July 14, 1957], while riding in an Army jeep.

> The main purpose of this letter is to bring up to your attention that [the veteran] has a [c]hronic [d]epressive condition, which[,] in my opinion, is service connected.

*Ibid.*

In March 1985, the veteran also submitted private medical records from St. Luke's Hospital with respect to a March 1971 nine-day hospitalization for back surgery. R. at 366–73. According to those records, the veteran's chief complaint was pain in the lower back and in the left leg, with the most recent onset four months previously. R. at 366. A myelogram had "revealed narrowing of L–4, 5 and L–5, S–1 discs, suggesting a protruded disc at L–5, S–1". R. at 366, 367. A surgical report included a preoperative diagnosis of "[r]uptured lumbar intervertebral disc, L5/S1, left", and indicated that Dr. Thompson

had performed a "[l]umbar laminectomy [with] removal of ruptured intervertebral disc tissue L5/S1 left". R. at 368. The veteran was discharged "much relieved from pain". R. at 369. August 1978 VA medical records (apparently not previously considered but submitted in March 1985) noted that after the veteran's 1971 surgery, he "went on to working [with] heavy equipment[,] ... hit a stump [about] 4 years ago[,] and his back has been getting worse ever since—little by little". R. at 377.

The BVA denied reopening of the back claim in October 1985, finding that the evidence submitted in support of reopening "does not change the factual basis on which the prior decisions were predicated" because the evidence "does not show the presence of a chronic back disorder while the veteran was in service[,] nor does it show the presence of a chronic back disorder until many years after he was separated from service." R. at 419, 418. In March 1986, the RO again denied reopening. R. at 426, 428.

In November 1989, the veteran sought to reopen his claim for service connection of a neurological condition (R. at 448); various medical records and SMRs previously of record were submitted on the veteran's behalf (R. at 456–513). In January 1990, the RO informed the veteran that his submissions had previously been considered; that therefore no action could be taken on his request to reopen; and that new and material evidence was required to reopen his claim. R. at 574. In June 1990, he submitted medical records from the VA Medical Center, Mental Hygiene Clinic (MHC), in Dublin, Georgia, showing treatment and therapy for the period May 1989 through May 1990. R. at 582–97. MHC progress notes for June through November 1989 stated: "PTSD [post-traumatic stress disorder] [g]roup participation". R. at 565, 567, 568, 589–97. Progress notes from April 1990 stated that the veteran "appear[ed] sad [and] apparently has several current stresses". R. at 585. A May 1990 VA psychology assessment report noted that he had been "treated for depression since the early 70's by reports in current chart" and a history of depression going back further as described by the veteran; that he "had been

followed by MHC [which had] recommended his admission ... for stabilization"; and that he has a "[d]ysthymic [d]isorder". R. at 604. (Dysthymic means "depressed", DORLAND'S at 519.)

A May 1990 VA medical record showed that physical therapy had been recommended for, inter alia, the veteran's "pain and swelling, left hand" (the primary clinical diagnosis) and "[r]eflex sympathetic dystrophy left hand" (the secondary clinical diagnosis). R. at 603. (Sympathetic reflex dystrophy is "a series of changes caused by the sympathetic nervous system, marked by pallor or rubor [redness, a sign of inflammation], pain, sweating, edema, or osteoporosis, following muscle sprain, bone fracture, or injury to nerves or blood vessels", DORLAND'S at 520–21, 1474.) The therapy consisted of "[p]araffin wax dripping to left hand" and "[g]rip strengthening exercises to left hand". *Ibid.* A VA consultation report noted "diminished grip strength of left upper extremity" and included a diagnosis of "[r]eflex sympathetic dystrophy[,] left hand". R. at 611. An accompanying x-ray report of his left hand and wrist showed a negative impression with "[s]oft tissue swelling of the left wrist" and "[n]o evidence of osteoporosis" R. at 623.

The veteran then sought an increased rating for his service-connected left-hand condition, stating in June 1990:

[The] problem with my left hand is the loss of grip causing me to drop objects (50%–60% loss of use I feel). I used to have burning sensation across the back of my hand and picked pieces of glass out of my hand for years. Now in a great while I still pick pieces of glass out of my hand.

R. at 623. A September 1990 RO decision denied an increased rating for service-connected residuals of his left-hand injury and denied reopening of his claim for service connection for a neuropsychiatric disorder. R. at 618–19. The decision noted: "The current treatment records do not show that the vet[eran] suffers with a service[-]incurred neuropsychiatric disorder." R. at 618. The appellant has asserted in this appeal that he never received notice of this decision.

In October 1990, the RO received the following additional VA medical records dating from May to September 1990. R. at 621–41. May 1990 progress notes reported complaints of mid-back and left-shoulder pain as well as left-hand weakness, and a history of "[d]epressive neurosis" and "[r]eflex sympathetic dystrophy of left hand". R. at 626. July 1990 notes reported constant pain in his left hand and low back region and recommended continued physical therapy, including, inter alia, grip-strengthening exercises for his left hand and "paraffin wax dripping to left hand". R. at 636. A December 1991 RO decision declined reopening his claims for back and neuropsychiatric conditions and denied an increased (compensable) rating for his service-connected left-hand condition. R. at 677, 681. He appealed to the BVA. R. at 689; *see also* R. at 718. In a July 1992 statement, he asserted that, inter alia, his "hand has become numb" and that he "can't hold a cup of coffee, or use it for putting on [his] clothes" (R. at 692–93), and attached copies of documents previously of record, including SMRs and VA records (R. at 694–701), and documents not previously of record, including VA records from March and April 1991 showing that he had received physical therapy (R. at 702) and July 1992 VA progress notes reporting his complaints of numbness in the left forearm, hand, and fingers, and left-hand weakness and the examiner's opinion that he has "poor effect in l[eft] hand grip ... [without] motor weakness" (R. at 703).

In the August 1993 BVA decision here on appeal, the Board denied reopening of the service-connection claims for back and neuropsychiatric disorders, and denied an increased (compensable) rating for "scars, left hand". R. at 15. As to the back claim, the Board found that evidence submitted since the January 1990 RO letter was not new and material. R. at 10. As to the neuropsychiatric claim, the Board found that evidence submitted since the September 1990 final RO decision was not new and material. *Ibid.* As to the left-hand increased-rating claim, the Board found that the schedular criteria for a compensable evaluation were not met. *Ibid.*

## II. Analysis

### A. Left–Hand Rating–Increase Claim

The veteran contends that the residuals of his service-connected left-hand condition

have increased in severity since he was awarded service connection and a noncompensable rating in the prior final June 1958 RO decision. R. at 615. At the time the RO awarded service connection in July 1958, a December 1957 VA examination report noted two small non-adherent scars on the dorsum of the left hand and a good grip. R. at 66. In its August 1993 decision, the Board concluded that a compensable rating was not warranted, finding that "there is no evidence that establishes that the [veteran's] pain and swelling [of his left hand] are related to his service-connected scars"; that there is "no evidence that the scars have caused a decrease in his range of motion of his hand or that the scars have caused him pain"; and that the "left hand scars are static and have not worsened since the original noncompensable rating". R. at 15.

■ Disability ratings are to be based, as far as practicable, upon the average impairments of earning capacity resulting from each disability and its residual conditions, in civil occupations. 38 U.S.C. § 1155; 38 C.F.R. § 4.1 (1995). The determination of the level of disability due to scarring is made under 38 C.F.R. § 4.118, Diagnostic Codes (DC) 7800 through 7805 (1995). *See Shipwash v. Brown*, 8 Vet.App. 218, 223 (1995). A veteran can receive separate disability ratings unless the conditions constitute the "same disability" or the "same manifestation" under 38 C.F.R. § 4.14 (1995). *See Esteban v. Brown*, 6 Vet.App. 259, 261 (1994). DC 7803 provides for a 10% rating for scars that are "superficial, poorly nourished, with repeated ulceration". DC 7804 provides for a 10% rating for scars that are "superficial, tender and painful on objective demonstration".

Pursuant to DC 7805, a scar can also be rated based "on limitation of function of part affected". In this case, the part affected by the scars relates to the veteran's left hand. The schedule of ratings for muscle injuries as to the forearm and hand, 38 C.F.R. § 4.73 (1995), provides for a 10% rating under DC 5307 where there is moderate loss of "[f]lexion of wrist and fingers" due to damage to "[m]uscles arising from internal condyle of humerus"; a 10% rating under DC 5308

where there is moderate loss of "extension of wrist, fingers[,] and thumb" due to damage to "[m]uscles arising mainly from external condyle of humerus"; and a minimum 10% rating under DC 5309 where there is "limitation of motion" in function of "grasping movements" of the forearm muscles, "supplemented by the intrinsic muscles [of the hand] in delicate manipulative movements". An additional note under DC 5309 provides: "The hand is so compact a structure that isolated muscle injuries are rare, being nearly always complicated with injuries of bone, joints, tendons, etc."

The appellant has been assigned a 0% rating for scars, but it is unclear under which DC—7803, 7804, or 7805—such a rating was assigned. Because the veteran's original claim in 1957 was for injuries to his left hand, grip loss (and not for the physical, superficial scar), and because his June 1990 statement and October 1990 submission of medical records indicated that he was requesting an increased rating for his service-connected left-hand condition based on loss of grip (R. at 615, 636), the Court will consider the appellant's claim for an increased rating for left-hand residuals to be a claim for an increased rating under DC 7805, which focuses, not on the superficial aspects of a scar, but on the limitation of function of the part affected. Because it is the veteran's hand that was affected, the appropriate ratings, as stated above, are found under DCs 5307—5309. Under DC 5309, a demonstrated level of grip loss is a manifestation which would entitle the veteran to an increased rating.

■ In its decision, the Board failed to discuss adequately DC 7805 and the criteria for a 10% rating under DCs 5307, 5308, and 5309, and the specific functions of muscles associated with those DCs. The criteria in DC 5309 appear to be particularly relevant in this case because the veteran has been asserting grip loss as a residual of his in-service hand injury since his original 1957 claim, submitted three months after discharge (R. at 29), and because the presence of fluid in the tissue of the dorsum of the veteran's left hand was noted in service (R. at 51) and at separation therefrom ("[t]aenia vesicul[a]r", R. at 23). After he filed his

original claim, a December 1957 VA examination report specifically characterized his ability to grip as "good" and also noted that his scar was nonsymptomatic (R. at 66–67) prior to the RO's assignment of a 0% rating in June 1958. Subsequently, a February 1961 medical statement from Dr. Jarrell reported an impression of "[w]eakness [in] left hand grip" (R. at 99). Not only did the Board in its August 1993 decision incompletely note Dr. Jarrell's impression as "weakness" rather than as weakness in the *grip* (R. at 14), but the decision failed to discuss grip loss at all. Although the Board did discuss the May 1990 x-ray results, which revealed swelling of the soft tissue of the left hand, it did not discuss the May 1990 VA medical records that gave a clinical diagnosis of "[r]eflex sympathetic dystrophy left hand" (R. at 603, 611) and "diminished grip strength of upper extremity" (R. at 611), and recommended therapy of "[g]rip strengthening exercises to left hand" (R. at 603, 636). The Court holds that the Board failed to provide an adequate statement of reasons or bases under 38 U.S.C. § 7104(d)(1) for rejecting the above evidence favorable to the veteran. *See Gabrielson v. Brown*, 7 Vet.App. 36, 39–40 (1994) (pursuant to 38 U.S.C. § 7104(d)(1), Board must analyze credibility and probative value of evidence, account for evidence which it finds to be persuasive or unpersuasive, and provide reasons for its rejection of all material evidence favorable to veteran).

Accordingly, the Court will vacate the Board decision as to the rating-increase claim and remand that matter for the Board to apply the above DCs together with the evidence of record relating to the veteran's diminishing grip strength. In addition, prior to readjudication, a new examination (in accordance with applicable regulations and taking into account the above DCs) should be obtained to address the extent of his disability and to provide a medical opinion as to whether the left-hand grip loss stems from any condition arising during service (for example, whether the swelling of the soft tissue over the wrist is caused by edema, the same condition that had existed in service (*see* R. at 51)). *See Green (Victor) v. Derwinski*, 1 Vet.App. 121, 124 (1991) (duty to assist may include "the conduct of a thorough and con-temporaneous medical examination, one which takes into account the records of prior medical treatment, so that the evaluation of the claimed disability will be a fully informed one"); 38 C.F.R. § 4.48 (physical examination of scar should include "whether it is painful, inflamed or keloid; adherent or nonadherent; whether it . . . is exerting traction or limiting normal motion of the parts involved; whether . . . there is bone or muscle loss, . . . and, if so, to what extent and how productive of interference with normal functions"); *see also Schafrath v. Derwinski*, 1 Vet.App. 589, 595 (1991); 38 C.F.R. § 4.2 (1993) ("if the [examination] report does not contain sufficient detail, it is incumbent on the rating board to return the report as inadequate for evaluation purposes"); 38 C.F.R. § 19.9 (1995) (requiring Board to remand matter when, during course of review, it finds that further evidence, or clarification of evidence, is essential for proper appellate decision).

### B. Claims to Reopen

*1. Generally applicable law.* Under the applicable law, the Secretary must reopen a previously and finally disallowed claim when "new and material evidence" is presented or secured with respect to the basis for the disallowance of that claim. *See* 38 U.S.C. §§ 5108 ("[i]f new and material evidence is presented or secured with respect to a claim which has been disallowed, the Secretary shall reopen the claim and review the former disposition of the claim"), 7104(b) ("when a claim is disallowed by the Board, the claim may not thereafter be reopened and allowed[,] and a claim based upon the same factual basis may not be considered"), 7105(c) ("[i]f no notice of disagreement [ (NOD) ] is filed in accordance with this chapter within the prescribed period, the action or determination shall become final and the claim will not thereafter be reopened or allowed, except as may otherwise be provided by regulations not inconsistent with this title"); *Suttmann v. Brown*, 5 Vet.App. 127, 135 (1993) (applying section 5108 to claim denied by final RO decision).

On a claim to reopen a previously and finally disallowed claim, a "two-step analysis"

must be conducted under section 5108. *Manio v. Derwinski*, 1 Vet.App. 140, 145 (1991). First, it must be determined whether the evidence presented or secured since the prior final disallowance of the claim is new and material when "the credibility of the [new] evidence" is presumed. *Justus v. Principi*, 3 Vet.App. 510, 513 (1992); *see Duran v. Brown*, 7 Vet.App. 216, 220 (1994) ("*Justus* does not require the Secretary to consider the patently incredible to be credible"). (The concurring opinion's analysis states that the presumption of credibility attaches to certain previously presented evidence. That matter is not raised by the facts of this case.) Second, if the evidence is new and material, the Board must then reopen the claim and "review the former disposition of the claim", 38 U.S.C. § 5108—that is, review all the evidence of record to determine the outcome of the claim on the merits. *See Jones (McArthur) v. Derwinski*, 1 Vet.App. 210, 215 (1991).

 As to step one, the determination whether to reopen a previously and finally disallowed claim, the Court has synthesized the applicable law as follows:

"New evidence" is that which is not merely cumulative of other evidence of record. [*See Colvin v. Derwinski*, 1 Vet.App. 171, 174 (1991).] Evidence is "material" where it is relevant to and probative of the issue at hand and where there is a reasonable possibility that, when viewed in the context of all the evidence, both new and old, it would change the outcome.

*Blackburn v. Brown*, 8 Vet.App. 97, 102 (1995); *Cox (Billy) v. Brown*, 5 Vet.App. 95, 98 (1993). A Board determination as to whether evidence is "new and material" for purposes of reopening is a question of law subject to de novo review by this Court under 38 U.S.C. § 7261(a)(1). *See Masors v. Derwinski*, 2 Vet.App. 181, 185 (1992); *Jones*, 1 Vet.App. at 213; *Colvin, supra*. Hence, it would rarely be necessary for the Court to remand, as the parties suggest, for the Board to make a new determination as to reopening. *See Annoni v. Brown*, 5 Vet.App. 463, 467 (1993).

 **2. Manio *step-one process*.** It has perhaps not been made expressly clear in prior cases that the first step of the *Manio* two-step process as to a claim to reopen involves three questions: **Question 1:** Is the newly presented evidence "new" (that is, not of record at the time of the last final disallowance of the claim and not merely cumulative of other evidence that was then of record, *see Struck v. Brown*, 9 Vet.App. 145, 151 (1996); *Blackburn, Cox*, and *Colvin*, all *supra*)? **Question 2:** Is it "probative" of "the issue[s] at hand" (*Cox* and *Colvin*, both *supra*) (that is, each issue which was a specified basis for the last final disallowance (*see Struck, supra*))? **Question 3:** If it is new and probative, then, in light of all of the evidence of record, is there a reasonable possibility that the outcome of the claim on the merits would be changed (*see ibid.*)? As *Blackburn* indicated, affirmative answers to both questions 2 and 3—involving the probative nature of the "new" evidence and the reasonable possibility of outcome change, respectively—are required in order for "new" evidence to be "material" (notwithstanding the concurring opinion's assertion to the contrary, section 5108 *requires* that a claim be reopened "[i]f new and material evidence is presented or secured"). *Blackburn*, 8 Vet. App. at 102. As to those two "materiality" components, the credibility of the newly presented evidence is generally presumed under *Justus* and *Duran*, both *supra*. In looking at the first materiality component (whether the evidence found to be "new" is also probative) the focus is on the new evidence; as to the second materiality component (whether there is a reasonable possibility that the outcome on the merits would be changed), the focus is on *all* of the evidence of record rather than just on the new evidence. *See Struck* and *Blackburn*, both *supra; Glynn v. Brown*, 6 Vet.App. 523, 528–29 (1994); *Cox* and *Colvin*, both *supra*.

 Regarding the question whether the new evidence is probative, evidence is "probative" when it "tend[s] to prove, or actually prov[es] an issue". BLACK'S LAW DICTIONARY 1203 (6th ed.1990) [hereinafter BLACK'S]. (The requirement that the newly presented evidence be "probative" necessarily incorporates the requirement that it be "relevant" since, by definition, all "probative"

evidence is "relevant". *Compare* BLACK'S at 1203 (probative) *with* BLACK'S at 1291 (defining relevant evidence as "[e]vidence tending to prove *or disprove* an alleged fact" (emphasis added))). Hence, in order to warrant reopening a previously and finally disallowed claim, the newly presented or secured evidence must be not cumulative of evidence of record at the time of the last prior final disallowance and must tend to prove the merits of the claim as to each essential element that was a specified basis for that last final disallowance of the claim. In determining whether evidence is thus probative (that is, whether it supplies evidence the absence of which was a specified basis for the last final disallowance), the specified basis or bases, as discernible from that last decision, for the disallowance must be considered. If the newly presented evidence is both new and probative, then, the claim will be reopened if, upon consideration of all the evidence (new and old), there is a reasonable possibility that the outcome would be changed. *See Struck, Blackburn, Glynn, Cox,* and *Colvin,* all *supra.*

■ In connection with today's holding, the Court stresses, as to the determination (during the *Manio* step-one process) of the materiality of evidence presented since the last final disallowance of the claim, that the newly presented evidence need not be probative of all elements required to award the claim (for example, as to a service-connection claim, *Caluza v. Brown,* 7 Vet.App. 498, 506 (1995), *aff'd,* 78 F.3d 604 (Fed.Cir.1996) (table), described three elements of a well-grounded claim: Competent evidence of in-service incurrence or aggravation of a disease or injury; a current disability; and a causal nexus between the inservice incurrence or aggravation and the current disability), but need be probative only as to each element that was a specified basis for that last disallowance. Indeed, to require that "old", probative evidence be put forward again would be inconsistent with the Court's long-standing holding that "new" evidence "is not that which is merely cumulative" of previously presented evidence. *Colvin, supra.*

■ Similarly, today's holding in no way suggests that the newly presented evidence must *itself,* without regard to the prior evidence of record, create a reasonable possibility of a changed outcome on the merits. Quite the contrary. The Court expressly reaffirms the conclusion in *Glynn,* 6 Vet.App. at 528–29, that the prior evidence of record is vitally important in determining newness as well as the reasonable possibility of a changed merits outcome for purposes of deciding whether to reopen a claim. *See Blackburn, supra* ("reasonable possibility that, when viewed in the context of all the evidence, both new and old, [the newly presented evidence] would change the outcome"); *Glynn, Cox,* and *Colvin,* all *supra.* It follows inexorably that the reasonable possibility of a changed outcome can be decided only by reviewing de novo the same evidence (that is, all of it) that would be reviewed were the claim actually to be reopened and the former negative disposition on the merits reevaluated. *See Jones,* 1 Vet.App. at 214 (once claim has been reopened, adjudicator is "to decide the merits of a reopened claim . . . [by] looking at the new and material evidence in the context of all the other evidence of record and not in isolation"); *Masors, supra* (determination whether to reopen claim is question of law subject to de novo review by Court); *Colvin, supra.*

As the discussions in parts II.B.4.a. (Neuropsychiatric disorder) and II.B.5. (Back disorder) show, under section 5108 there would be new and material evidence to reopen each of the claims in question if the Court were to conclude that the last merits decision was the last final "disallowance" of the claim. The fact situation here thus requires the Court to decide whether, for purposes of determining whether to reopen a claim, all the evidence since the last final denial on the merits or only since the last final consideration of the claim is to be considered as newly presented. The answer to that question is dispositive of whether the claims are to be reopened in this case. The Secretary has suggested that *Glynn,* 6 Vet.App. at 528–29, provided a definitive answer to that question. Brief (Br.) at 12; *see also Duran,* 7 Vet.App. at 221 (applying *Glynn*). As the ensuing discussion illustrates, the Court disagrees.

**3. Interpretation of "disallowed" in section 5108.** The critical issue in determining which evidence is to be considered as newly presented for purposes of deciding whether to reopen a claim is the meaning of the term "disallowed" in the following sentence in section 5108: "If new and material evidence is presented or secured with respect to a claim which has been disallowed, the Secretary shall reopen the claim and review the former disposition of the claim." 38 U.S.C. § 5108.

In *Edenfield,* the en banc Court interpreted the term "disallowed" without the limiting words "on the merits". *Edenfield v. Brown,* 8 Vet.App. 384, 389 (1995). The Court held that a claim that is found not well grounded is a claim that is "disallowed" for purposes of sections 7104(b) and 5108. *Id.* at 390 ("a veteran, who elects to file a claim without sufficient evidence to 'ground' it, and consequently has it disallowed, will ... have to produce new and material evidence .before the adjudicators have authority to reopen and allow the previously disallowed claim"). Subsequently, in *Graves v. Brown,* the Court, citing *Edenfield* (for a proposition analogous to its holding) and 38 U.S.C. § 5110(a), held that an application to reopen a previously and finally disallowed claim is itself a claim for VA benefits and does not lose its status as a claim if new and material evidence has not been submitted. *Graves,* 8 Vet.App. 522, 524 (1996); *see also* 38 C.F.R. § 3.160(e) (1995).

Hence, under *Edenfield* and *Graves* an unsuccessful claim to reopen a prior final disallowance of a claim is, just as *Edenfield* held as to a claim found not well grounded, a claim that is "not allowed, that is *dis* allowed." *Edenfield,* 8 Vet.App. at 389–90. A decision by an RO or the BVA refusing, because of a lack of new and material evidence, to reopen a previously and finally disallowed claim, after having considered newly presented evidence, is, in the truest sense of the word, another "disallowance" of a claim—the claim to reopen—because that claim is not being "allowed".

▇▇▇ In sum, *Edenfield* teaches that neither section 5108 nor the statutory scheme provides that a claim can be "disallowed" only where there has been a disposition *on*

*the merits.* Accordingly, the Court holds, in line with *Edenfield,* that sections 5108, 7104(b), and 7105(c) require that in order to reopen a previously and finally disallowed claim (whether decided by the BVA or an RO) there must be "new and material evidence presented or secured" (that is, present in the claims file, in fact or constructively, *see Bell v. Derwinski,* 2 Vet.App. 611 (1992), or having been submitted to VA by or on behalf of the claimant) since the time that the claim was finally disallowed on any basis, not only since the time that the claim was last disallowed on the merits.

The Court will now proceed to apply the above holding and the analysis in part II. B.2., above, to the facts of the two claims to reopen at issue in this case.

**4. Neuropsychiatric disorder.** In its August 1993 decision, the Board stated that the issue as to this claim was "whether the evidence submitted since the September 1990 RO decision [wa]s new and material so as to warrant reopening [of] the veteran's claim." R. at 14. The Board then found that evidence "essentially cumulative" as well as not material because it showed only "evidence of a current psychiatric disorder", and not "that the current disorder was caused by his period of service". *Ibid.* The Board thus did not reopen the claim. The appellant contends that the Board selected too brief a time period for examining whether new evidence had been submitted and should "go back to July 17, 1979[,] to find a final decision on the nervous disorder." Br. at 17–18. Although the Secretary contends that the evidence submitted since the last denial on the merits should be considered, he does not identify which is that VA decision in this case.

▇▇▇ **a. New and material evidence:** The specified basis for the RO's September 1990 denial of reopening was the lack of evidence showing a "service[-]incurred neuropsychiatric disorder". R. at 618. Applying the Court's holdings in part II.B.2. and 3., above, the Court concludes that the last final disallowance of that claim was the September 1990 RO decision denying reopening, and the Court must thus review, as the newly presented evidence, the evidence submitted

since that decision in order to determine whether that evidence is new and material evidence to reopen the claim. Considering that newly presented evidence, the Court concludes that there is no new and material evidence to reopen the claim.

As pointed out in part II.B.2., above, in order to make that determination of newness, the adjudicator must consider all of the evidence previously presented, and to make the determination as to whether "new" evidence is probative, the adjudicator must consider the specified bases for the last final disallowance of the claim. Therefore, in order to satisfy the first two questions of the *Manio* step-one process for determining whether to reopen this claim, newly presented evidence that is probative is required, that is, evidence tending to show that the neuropsychiatric condition derives from a disease, within the meaning of the law, that is connected to the veteran's service. The lack of such evidence was the RO's basis for its September 1990 denial of the claim and is thus the "issue at hand" to which "new" evidence must be directed in order for the disallowed claim to be reopened. The evidence submitted since September 1990 consists of the May 1990 VA diagnosis of "dysthymic disorder" (R. at 604), which constitutes competent medical evidence of a current disorder—one of the requisite elements of a claim for service connection—and is newly presented evidence that is not cumulative of evidence presented before that decision. It is therefore "new".

However, on its face, that evidence is not probative of the issue at hand, the element relating to a nexus between the veteran's service and his current depressive condition, the absence of which was a basis for the last (September 1990) final disallowance of this claim. *See Struck, Blackburn,* and *Cox,* all *supra; see also Heuer v. Brown,* 7 Vet.App. 379, 386–87 (1995) (holding that there was no new and material evidence to reopen claim where newly presented evidence was not "accompanied by any medical evidence indicating a nexus to service"); *Caluza,* 7 Vet.App. at 506 (requisite elements of service-connection claim include medical evidence of nexus between in-service injury or disease and cur-

rent disability); *Moray v. Brown,* 5 Vet.App. 211, 214 (1993) (lay assertions of medical causation cannot suffice to reopen a claim under § 5108). Because Dr. Orea's December 1983 statement (the veteran has a "[c]hronic [d]epressive condition, which [Dr. Orea believes] is service connected", R. at 298), which is probative on the nexus issue, was previously before the RO at the time of its September 1990 final decision denying reopening (R. at 618–19), and because the Court's holding today limits the determination as to what evidence is newly presented to that presented since the last disallowance on any basis, that statement cannot be newly presented evidence for purposes of the current decision on reopening the claim. (Had the Court interpreted the term "disallowed" as permitting newly presented evidence to include that presented since the last merits decision, Dr. Orea's statement (presuming its credibility under *Justus, supra,* for purposes of determining whether there is new and material evidence to reopen a claim) would have been new and material, because it would have been probative and would have presented a reasonable possibility, when considered with the rest of the evidence of record, of changing the merits outcome.) There being no newly presented evidence that is probative of the nexus issue, this is not a case where the Court considers whether newly submitted, probative evidence combined with all evidence submitted before the last disallowance of the claim, would present a reasonable possibility of changing the merits outcome such that the claim would be reopened. That issue is not reached on the facts of this case. Accordingly, the Board's decision not to reopen this claim was not in error.

*b. Notice of September 1990 RO decision:* The appellant contends that he was never notified of the September 1990 RO decision or of his right to appeal it, and that thus that decision is still open. Br. at 19. If the appellant is correct, then this would mean, as discussed in part II.B.4.a., above, that the last final disallowance as to the neuropsychiatric claim would have been the July 1979 Board decision, that Dr. Orea's 1983 statement would thus constitute new and material evidence to reopen the claim,

and that a remand for adjudication on the merits would be required. *See Masors* and *Jones,* both *supra; Hauck v. Brown,* 6 Vet. App. 518, 519 (1994) (per curiam order) (holding that where it is conceded that appellant "never received notification of any denial . . ., the one-year period within which to file an NOD, which commences with 'the date of mailing of notice of the result of initial review or determination,' did not begin to run" (quoting 38 U.S.C. § 7105(b)(1))). This Court has held that there is a "presumption of regularity", as applied to the mailing of BVA decisions pursuant to 38 U.S.C. § 7104(e), that " 'the Secretary and the BVA properly discharged their official duties by mailing a copy of a BVA decision to the claimant and [to] the claimant's representative, if any, on the date the decision is issued', and that that presumption can be overcome only by 'clear evidence to the contrary' ". *Davis v. Brown,* 7 Vet.App. 298, 300 (1994) (quoting *Ashley v. Derwinski,* 2 Vet.App. 307, 308–09 (1992) (*Ashley II*)); *see Morris v. Sullivan,* 897 F.2d 553, 560 (D.C.Cir.1990) (quoting *United States v. Chemical Foundation,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926), to the effect that "[t]he presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties"); *cf. Chute v. Derwinski,* 1 Vet.App. 352, 353 (1991) (per curiam order) (presumption of regularity rebutted where veteran claimed not to have received BVA decision and provided evidence of having made inquiries to VA after decision was mailed, and VA provided no evidence of having mailed decision).

That presumption applies equally to VA's mailing of RO decisions. *See Mason (Sangernetta) v. Brown,* 8 Vet.App. 44, 53–55 (1995); *Mindenhall v. Brown,* 7 Vet.App. 271, 274 (1994). Thus, the presumption applies in this case to the mailing of notice of the September 1990 RO decision to the veteran at his last known address of record (there is no indication in the record on appeal that the veteran had a representative at that time). *Cf. Thompson v. Brown,* 8 Vet.App. 169, 179 (1995) (holding that, absent evidence that claimant took affirmative steps after

filing VA Form 1–9 (Substantive Appeal to BVA) to change address he provided on it, BVA was entitled to rely on that address as being his "last known address" under 38 U.S.C. § 7104(e) and to use it for purposes of mailing copy of its decision), *reconsidered* and *reaff'd,* 9 Vet.App. 173 (1996) (per curiam order).

An appellant's mere assertion of nonreceipt of notice of an RO decision, such as the appellant's assertion in this case that he had received no notice of the September 1990 RO decision, is not "clear evidence" to rebut that presumption of proper mailing. *See Mindenhall, supra* (mere statement of nonreceipt is "not the type of 'clear evidence to the contrary' which is sufficient to rebut the presumption of regularity of the notice" (quoting *Ashley v. Derwinski,* 2 Vet.App. 62, 64 (1992), *reaff'd by Ashley II, supra*)); *cf. Thompson,* 8 Vet.App. at 178–79 (presumption that Board mailed requisite notices to veteran's "last known address" under 38 U.S.C. § 7104(e) rebutted by clear evidence that veteran claimed not to have received BVA decision; that he provided supporting evidence in form of letters and an irregular process of communication between veteran and RO; and that Board did not mail requisite notices to two addresses used); *Chute, supra.* Because the appellant has not rebutted the presumption that notice of the September 1990 RO decision was properly mailed, that decision became final. *See Falzone v. Brown,* 8 Vet.App. 398, 402 (1995) (where appellant had not rebutted presumption that notice of RO decision was properly mailed, that decision became final). Having held in part II.B.4.a., above, that there was no new and material evidence to reopen that final RO decision, the Board decision to that same effect will be affirmed as to this claim. *See Heuer, supra.*

**5. Back disorder.** As to the back claim, in its August 1993 decision, the Board determined that the evidence submitted since the January 1990 RO letter was not new and material. R. at 13.

Applying the Court's holdings in part II. B.2. and 3., above, the Court concludes that the BVA's September 1978 merits decision

was not the last final disallowance of that claim; and that there currently is no new and material evidence regardless of whether the last final disallowance of that claim was the BVA's October 1985 decision not to re-open the back claim or the RO's January 1990 letter (which refused to consider the request to reopen). That is because the evidence submitted since either date is not probative of the issue at hand, the essential element of the claim that was the basis for the last final disallowance of the claim—whether the current condition is connected to service. *See Struck, Blackburn,* and *Cox,* all *supra.* The BVA had indicated in October 1985 that there was no evidence of a nexus between the veteran's chronic back disorder and service. R. at 419. The absence of nexus evidence was the specified basis for the last final disallowance of this claim and must be remedied by the newly presented evidence in order for it to be found to be probative. It was not. Because Dr. Thompson's February 1983 statement ("there seems to be a causal relationship suggesting that [the veteran's] low back condition had its origin in the jeep accident of 1957", R. at 284), which is probative on the nexus issue, was before VA at the time of the October 1985 final Board decision (R. at 419) and the newly presented evidence is limited to that presented since the last disallowance on any basis, that statement is not newly presented evidence for purposes of the current decision on reopening that claim and thus cannot be the probative "new" evidence needed to re-open. (Had the Court interpreted the term "disallowance" as permitting newly presented evidence to include that presented since the last merits decision, that statement (presuming its credibility under *Justus, supra* ) would have been new and material, because it would have been probative and would have presented a reasonable possibility, when considered with the rest of the evidence of record, of changing the merits outcome.) There being no newly presented evidence that is probative as to the nexus issue, the reasonable-possibility question does not arise, and the Board's decision not to reopen this claim will also be affirmed.

***6. Prior final decisions not reviewable on this appeal.*** Whether the neuropsychiatric

and back claims should have been reopened on prior occasions based on Dr. Orea's and Dr. Thompson's statements, respectively, are issues not now before the Court. Whether either issue can properly be raised as a claim of clear and unmistakable error (CUE) in a prior RO decision under 38 C.F.R. § 3.105(a) is for another day. *See Smith (William) v. Brown,* 35 F.3d 1516 (Fed.Cir.1994); *Russell v. Principi,* 3 Vet.App. 310, 313 (1992) (en banc) (valid CUE claim requires assertion of "more than a disagreement as to how the facts were weighed or evaluated" in prior adjudication of claim); *compare Caffrey v. Brown,* 6 Vet.App. 377, 380–84 (1994) (VA's breach of duty to assist in failing to secure available relevant evidence prior to disputed adjudication held no basis for collateral attack on prior adjudication via CUE claim even though that relevant evidence had later led to award of service connection), *with Mason,* 8 Vet.App. at 52–53 (remanding to Board claim to reopen because of Board's failure to provide adequate statement of reasons or bases as to why prior RO decision's erroneous denial of "existence of evidence" was not CUE in terms of whether that evidence, if considered, would manifestly change the outcome on the merits). *But see Caffrey,* 6 Vet.App. at 384–88 (Steinberg, J., concurring in part and dissenting in part).

### III. Conclusion

Upon consideration of the record and the submissions of the parties, the Court affirms in part the August 1993 BVA decision as to the denial of reopening of the service-connection claims for neuropsychiatric and back disorders; the Court vacates the decision in part and remands the matter of an increased (compensable) rating for left-hand scar residuals for expeditious further development and readjudication, on the basis of all applicable law and regulation, and issuance of a readjudicated decision supported by an adequate statement of reasons or bases, *see* 38 U.S.C. §§ 5107(a), (b), 7104(a), (d)(1), 7261; 38 C.F.R. § 4.73; *Fletcher v. Derwinski,* 1 Vet. App. 394, 397 (1991)—all consistent with this opinion and in accordance with section 302 of the Veterans' Benefits Improvements Act, Pub.L. No. 103–446, § 302, 108 Stat. 4645, 4658 (1994) (found at 38 U.S.C. § 5101 note)

(requiring Secretary to provide for "expeditious treatment" for claims "remanded" by BVA or Court). *See Allday v. Brown*, 7 Vet.App. 517, 533–34 (1995). "On remand, the [claimant] will be free to submit additional evidence and argument" on the remanded claim. *Quarles v. Derwinski*, 3 Vet.App. 129, 141 (1992). The Court denies the Secretary's motion for summary affirmance. A final decision by the Board following the remand herein ordered as to the rating-increase claim will constitute a new decision which, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board final decision is mailed to the appellant.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

NEBEKER, Chief Judge, concurring:

I concur in the result, but I am not sanguine that the part of the opinion addressing new and material evidence will aid individuals dealing with reopening in the task of sorting through the myriad efforts by older veterans to resurrect their claims. My concurrence is based on what I believe the reasoning of the Court should be in this regard, which is:

A reopening analysis requires that the currently submitted evidence be presumed credible for purposes of deciding whether it is new and material, and, if so, whether it is possibly productive of a different result. Combining the two questions of materiality and possible different result, as the Court's opinion does (opinion at 14), is a legal impossibility. New evidence can be material, but of such de minimis weight that it could not possibly produce a different result.

This currently presented evidence must be viewed in light of all previously submitted evidence, i.e., that which was considered in a final denial on the merits and any evidence submitted thereafter in an unsuccessful earlier effort at reopening. The latter evidence is to be presumed truthful for the reopening inquiry, but, as with the current evidence, is then subject to a determination of relevance again, and, if so, of its credibility if the former disposition is reviewed on reopening.