**Dorothy M. MOFFITT, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

No. 94–764.

United States Court of Veterans Appeals.

Argued April 25, 1996.

Decided April 29, 1997.

Benjamin J. Kaufman, for appellant.

Rosalind Eager, Washington, DC, with whom Mary Lou Keener, General Counsel; Ron Garvin, Assistant General Counsel; and Thomas A. McLaughlin, Deputy Assistant General Counsel, were on the pleadings, for the appellee.

Before HOLDAWAY, IVERS, and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, widow of World War II combat veteran Douglas Moffitt, appeals a July 1, 1994, Board of Veterans' Appeals (BVA or Board) decision denying (1) reopening as to a claim for accrued benefits based on a claim for a total disability rating due to individual unemployability (TDIU); (2) an award of dependency and indemnity compensation (DIC) based on asserted service connection for the cause of the veteran's death, under 38 U.S.C. § 1310, after having reopened the claim; (3) burial benefits; and (4) an effective date earlier than May 1, 1988, for an award of DIC based on 38 U.S.C. § 1151. Record (R.) at 4, 16–17. For the reasons that follow, the Court will affirm in part and vacate in part the Board decision and remand certain matters to the Board for readjudication.

## I. Background

The veteran had active military service from July 1944 to May 1946. R. at 21, 307. In January 1945, he was wounded in action by a high-explosive shell fragment and incurred injuries to his abdomen, perineum, and scrotum, and perforating wounds of the urinary bladder, ilium, urethra, and sigmoid colon. R. at 21, 23–24, 31, 177. While in service, he underwent extensive surgery and prolonged convalescence. R. at 21, 24–25, 234. Service medical records (SMRs) included a March 1945 x-ray report finding that "[a] pyriform density 1 cm. in length [was lying] in the region of the middle major calyx of the left kidney" that "might well be renal calculus" (R. at 26); and an August 1945 x-ray report noting that "kidney shadows are normal in size, shape, and position" and that there were "moderately enlarged and blunted minor calyces on the right side" of the right ureter (R. at 32). (Calyx or calix is a "flower shaped or funnel-shaped structure; specifically one of the branches or recesses of the pelvis of the kidney into which the orifices of the malpighian renal pyramids project", STEDMAN'S MEDICAL DICTIONARY 263, 262 (26th ed. 1995).) The SMRs also included February and May 1945 physical examination reports noting a heart that was not enlarged and that had regular rhythm with no murmurs (R. at 141, 232); and March and September 1945 chest x-ray reports containing a diagnosis of a "[h]ealthy [c]hest" (R. at 149) and noting "no evidence of pulmonary or cardiac disease" (R. at 33). An April 1946 x-ray report of the veteran's chest noted: "Old thickened pleura in the left costophrenic sulcus of no present clinical importance. Otherwise normal heart, lungs[,] and bony thorax." R. at 262. He was medically discharged in May 1946. R. at 21.

In February 1947, a Veterans' Administration (now Department of Veterans Affairs) (VA) physical examination report noted normal cardiovascular and respiratory systems. R. at 310, 313. The examiner described the veteran's residuals as: "Well-healed [gunshot wound (GSW) ] scars of perineum. Well-healed post-operative suprapubic cystostomy, colostomy (right para-umbilical left lumbar (removal of left ureteral calculus, lower midrectus) (repair of bladder) scars[) ]. Well-healed sacral ulcer (scar of pressure sore)." R. at 316. The diagnosis was "[i]ntestinal obstruction intermittent partial based on history, [seco]ndary to GSW abdomen" and "[c]icatrices, healed, post traumatic [and] post surgical [seco]ndary to GSW abdomen". R. at 317.

In October 1947, a VA regional office (RO) granted service connection for resection of the ileum, with partial obstruction; resection of the large bowel, with polyposis, with partial obstruction; GSW, abdominal wall, muscle group XIX; impotence with loss of the right testicle, analogous to loss of both testicles; laceration of the bladder, urinary; laceration of the urethra; nephrolithiasis, left. R. at 322. (Nephrolithiasis is "a condition marked by presence of renal calculi", DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1109 (28th ed. 1994).) The injuries were assigned a combined disability rating of 100% from May 1946. R. at 322, 325. On the

basis of an April 1953 VA examination, the combined rating was reduced to 60%, effective March 1953. R. at 324–28. The veteran was also awarded special monthly compensation on account of anatomical loss of a creative organ. R. at 325, 328. These ratings continued until his death.

In September 1979, the veteran filed a TDIU claim. *See* R. at 333. A January 1980 RO decision denied his TDIU claim. R. at 333. In June 1982, he was admitted to the VA Medical Center (VAMC) in Tucson, Arizona, with a two-day history of fevers and chills and was diagnosed with "[r]ight upper lobe infiltrate" of the lungs. R. at 359. At that time, his blood pressure was 140/90. *Ibid.* He was also diagnosed with, inter alia, chronic pain syndrome, status post GSW, and increased prothrombin time. *Ibid.* (Prothrombin is the substance in the blood essential to the clotting process and, hence, to the maintenance of normal hemostasis, "a protein present in the plasma that, in theoretical hemotology, is converted to thrombin", DORLAND'S at 1371, 605.) A cardiovascular examination showed "the PMI [point of maximal impulse—heartbeat] to not be appreciable", and there was "a faint summation gallop present with no murmurs or rubs". R. at 357, 359. The veteran left the hospital against medical advice. R. at 358.

In October 1982, he was hospitalized at the VAMC in Loma Linda, California, for complaints of low back pain and bilateral leg pain. R. at 360. Present conditions included bronchitis and asthma, and reported history included "numerous bouts of pneumonia", "four myocardial infarctions in the early part of 1982 with angina", "calcified left kidney with multiple small stones", multiple bladder infections, and phlebitis. R. at 361. At that time, he denied any high blood pressure and admitted to swelling of his ankles and having palpitations. R. at 362. Examination of the lungs revealed "[d]ecreased breath sounds at the bases bilaterally" with slight inspiratory and expiratory wheezes. R. at 363. With respect to his cardiovascular system, he had "[t]achycardic with an irregular rhythm" and no murmurs. *Ibid.* The reported impression was, inter alia, history of heart disease and calcified left kidney. R. at 364. While

hospitalized, he experienced increased shortness of breath and diminishing mental status. R. at 372–73.

On November 11, 1982, he died while in that VAMC. R. at 367, 373, 375. An autopsy protocol reported the following causes of death: "Congestive heart failure, weeks, due to myocardial infarction, weeks, due to coronary arteriosclerosis, years. Contributing [c]ause: Pulmonary emphysema and cardiac hypertrophy." R. at 367–71. Examination of the left kidney showed "multiple indented irregular scars at both poles, slightly greater in the upper pole" with "no evidence of hydronephrosis", and "no renal calculi". R. at 369. (Hydronephrosis is the "distention of the pelvis and calices of the kidney with urine, as a result of obstruction of the ureter", DORLAND'S at 785.) The autopsy report noted that the ureters "are unobstructed in their course to the bladder which contains approximately 50cc. of urine." *Ibid.* Microscopic examination of the kidneys revealed "moderate renal arteriosclerosis with prominent [illegible] scarring". Additionally, "large areas of tubular atrophy and accompanying chronic inflammation are present in the interstitial regions. Glomeruli are focally senescent; however, those intact, show no diagnostic abnormalities." R. at 370. (Glomeruli, plural of glomerulus, which is a tuft or cluster, as one composed of blood vessels or nerve fibers, DORLAND'S at 700, 701.)

In April 1983, the appellant filed an application for DIC under 38 U.S.C. § 1310 based on the veteran's death from service-connected disability [hereinafter § 1310 DIC claim] and provided a copy of the veteran's death certificate. R. at 384–90. That same month, the RO denied that § 1310 DIC claim on the ground that the evidence showed "no heart disease in service or within presumpti[on] period" and because the veteran's service-connected disabilities were "not shown to have hastened or contributed to [his] death." R. at 392. In November 1983, the appellant filed another DIC claim, this one under 38 U.S.C. § 351 (now § 1151) based on assertions that VA's treatment of the veteran had hastened his death [hereinafter § 351 (or § 1151) DIC claim], and she contended that

the veteran should have received BVA appellate consideration of his 1979 TDIU claim denied by the RO in January 1980. *See* R. at 399. A May 1983 letter from the Director of the VAMC in San Diego, California, to the San Diego VA District Counsel (D.Couns.) office, referred to an administrative tort claim by the appellant for the alleged wrongful death of the veteran; indicated that a letter dated April 21, 1983, from the D. Couns. office was referred to Dr. Shure, Chief of the Pulmonary Section at the San Diego VAMC, and Dr. LeWinter, Acting Chief of Cardiology there; and enclosed responses from the two VA physicians. Supplemental (Suppl.) R. at 1–5. (The April 21, 1983, letter is not included in the record on appeal (ROA).) Dr. Shure's report described the condition and treatment of the veteran at the Loma Linda VAMC, and answered questions apparently posed in the D. Couns. office's April 1983 letter, including whether the drugs administered at the VAMC could have caused respiratory depression, whether VA's multiple transfers of the veteran in and out of the pain and pulmonary units were appropriate, and whether VA's treatment of his congestive heart failure was adequate. Suppl. R. at 2–3. Dr. Shure concluded by stating that the veteran's congestive heart failure "may not have been" appropriately treated and that the "steroids probably should have been discontinued and his pain medications reduced or stopped earlier although the serum drug levels do not support their role in his demise". Suppl. R. at 3. Dr. LeWinter concurred with Dr. Shure, adding that he could not "give a definite answer" as to whether the treatment given to the veteran for his heart was appropriate and noting: "Lacking invasive information, it becomes a matter of extraordinary [sic] difficult clinical judgment as to how important heart failure is in a patient such as this, and in view of his multiple other problems, how exactly to treat it." Suppl. R. at 5.

A December 1983 RO decision denied § 351 DIC. R. at 394–95. The appellant appealed this decision. *See* R. at 397–402. In June 1984, the Board remanded the case for additional development. *See* R. at 406. On remand, the RO in February 1985 again denied this § 351 claim and also denied a TDIU claim. *Ibid.* (The ROA does not contain the February 1985 RO decision; apparently the TDIU claim refers to an accrued-benefits claim under 38 U.S.C. § 5121.)

In October 1986, the D. Couns. office provided a litigation status report to the VA General Counsel's office in Washington, D.C., attaching pleadings that showed that the appellant's case against the United States, under the Federal Tort Claims Act, was settled for $95,000. Suppl. R. at 6–14. In December 1986, the Board again remanded the § 351 DIC claim for further development, and the RO denied that claim after considering the two VA physicians' May 1983 opinions. *See* R. at 409, 442. In a December 1987 decision, the Board denied the § 351 DIC claim, finding that the "veteran's death was irrespective of the treatment provided and any factor arising from the treatment was a foreseeable result of approved treatment" and (citing, inter alia, 38 C.F.R. § 3.358(c)(3)) concluding that the "veteran's death was neither an accident resulting from [VA] medical or surgical care nor the result of carelessness, negligence, lack of proper skill, error in judgment, or other instance of indicated fault on the part of [VA]". R. at 419–20.

In a separate December 1987 decision, the Board denied the appellant's claim for accrued benefits based on TDIU due to service-connected disabilities. R. at 421–29. The Board found that the veteran's service-connected disabilities were: Residuals of a partial small bowel resection; residuals of an abdomen shell-fragment wound (SFW), involving Muscle Group XIX; residuals of a right testicle removal; a bladder laceration; laceration of the urethra; left nephrolithiasis; and residuals of large bowel surgery. R. at 429.

In February 1989, the appellant attempted to reopen as to her § 351 DIC claim and accrued-benefits TDIU claim. *See* R. at 481, 490. In March 1989, the RO denied those claims, finding no new and material evidence warranting a reopening. R. at 481. That same month, she appealed the March 1989 decision. R. at 486. A January 1990 letter from the D. Couns. office to the VA General

Counsel office in Washington, D.C., responded to an inquiry as to whether the D. Couns. office had any medical opinion that could be provided to the Board "to assist them in evaluating the ... [section] 351 appeal", and enclosed a copy of a medical opinion, with the identity of the author deleted, that had formed the basis for a settlement recommendation by the Assistant U.S. Attorney. R. at 493. The enclosed medical opinion, dated January 28, 1986, noted that the veteran's condition upon admission to the Loma Linda VAMC in October 1982 had included heart disease that "was not insignificant", and that the veteran went home on a pass and had "taken an overdose of Theodur for his asthmatic bronchitis while he was out on pass" and had returned in "dire straits". R. at 494–95. The physician opined:

> The next catastrophe occurred on or about 11/2/82 involving a clear-cut fluid overload associated with the previous use of hypotonic saline solution intravenously. Interestingly, a urologist who consulted on the case on that date indicated there was nothing wrong with the kidneys and that it was the congestive heart failure that needed evaluation and treatment. Nevertheless, even though attention was given to the fluid balance with subsequent correction of electrolyte contents, no real attention was given to the problem of congestive heart failure and the underlying cardiac problem.... The occurrence of the infarction on or about 11/2/82 in association with the fluid overload would be consistent with what appears to have been found at the time of the autopsy. That is, the description at autopsy appears to be between one and two weeks['] duration.
> He did not have primary liver disease nor primary kidney disease that contributed to the fatal outcome. One kidney was scarred quite a bit but this contributed nothing to the outcome.
> For purposes of general guidance, the management of congestive heart failure, particularly in the face of subacute myocardial infarction, includes more aggressive digoxin to increase the efficiency of the remaining heart muscle, [and] the administration of lasix to get rid of fluid and reduce the load on the heart, [and] the

administration of nasal oxygen and sedation. I find no evidence that lasix was administered past 11/3/82[,] and of course there is no evidence to indicate more critical attention to the [veteran's] serum digoxin level.

R. at 495–96.

In an April 1990 Board decision, the matter was remanded for the RO to associate with the claims folder "the *complete* medical records (not just summaries), to include all specialist's reports and notes" regarding the veteran's terminal hospitalization. R. at 499. The records were then sent to the RO. R. at 502–761. Included among these were handwritten notes dated November 1, 1982, that stated impressions of "Left renal stones with irregular decrease in renal cortex, most likely due to chronic inflammation" (*ibid.*) and nephrolithiasis (R. at 542, 546). A renal echogram conducted at that time revealed the following findings: "There is irregularity of the renal contour of the upper and lower poles consistent with scars from chronic pyelonephritis. There are severe foci of calcification seen in the left kidney compatible with stones. No cyst or mass is visualized in the left kidney. The right kidney is normal." R. at 587.

In July 1990, the appellant filed a claim to reopen her § 1310 DIC claim. *See* R. at 828. An August 1990 RO decision denied reopening as to this claim and the accrued-benefits TDIU claim. *See* R. at 829. The appellant and her sons gave sworn testimony before the RO in December 1990. R. at 767–806. A June 1991 Board decision found that the evidence newly presented since the Board's December 1987 decision was new and material and thus warranted reopening as to the appellant's § 351 DIC claim; the Board decision awarded DIC. R. at 810–17. In July 1991, the RO apparently continued the denial of her § 1310 DIC claim. *See* R. at 823.

As to burial benefits, in January 1983, the appellant had filed an application for such benefits, attaching copies of her marriage certificate and the veteran's death certificate. R. at 375, 377–79. A February 1983 RO letter to the appellant informed her that further information, including a "receipted

funeral bill", was needed to process her claim. R. at 382. In August 1986, the appellant inquired as to the status of her claim. *See* R. at 433. The RO responded: "Our records indicate that your claim for [b]urial benefits was denied as you did not provide the requested [b]urial receipts requested in 1983. You had two years in which to file." R. at 433. In January 1987, the appellant asserted to the RO that her application was timely filed and provided copies of a card file from the Veterans of Foreign War (her representative at the time), the funeral receipt, and a check for payment of funeral expenses. R. at 432–37. In May 1989, the RO again informed her that "burial allowance may not be granted since the requested evidence was not received within the time limit for payment". R. at 484. In July 1990, the appellant submitted another application, which the RO denied in January 1991 as being untimely. *See* R. at 808, 838.

In July 1991, the appellant again sought reopening as to her accrued-benefits TDIU claim. R. at 821. She stated that the veteran had filed for TDIU in October 1979 and that this claim "has never been resolved". *Ibid.* She asserted that the June 1984 BVA remand decision had noted that an appellate decision was to be made on this claim but that those instructions were never followed. *Ibid.* In August 1991, she filed a Notice of Disagreement (NOD) as to an effective date of March 1989 apparently assigned by the RO as to its award of the § 351 DIC claim, contending that the effective date should be that of her husband's death in November 1982. R. at 823. In September 1991, the RO notified the appellant that her § 351 DIC benefits had been awarded to reflect that she had reopened her claim on April 29, 1988, and that her award would thus be effective from May 1, 1988. Suppl. R. at 33.

She also filed an NOD as to the July 1991 RO denial of her § 1310 DIC claim; she noted the following: That he had a "history of urinary tract infection to [sic] his surgery, left kidney incision in 1945, and was taking medications for this problem up until he died. His bladder and urethra were injured by shrapnel and rated service connected." R. at 823. She appealed as well the RO's January 1991 denial of burial benefits. R. at 823, 842–43; *see* R. at 838.

In March 1992, the appellant and her sons gave sworn testimony before the RO. R. at 845–909. The appellant testified under oath that in September 1991 she had filed a claim for service connection for the veteran's left-kidney condition and that she would like that claim to be included in the accrued-benefits TDIU claim. R. at 848. She referred to a January 8, 1992, letter she had written to Dr. Lu, Chief of General Medical Section at the Loma Linda VAMC requesting further information concerning the veteran's death. R. at 873–74. She testified that he had responded in a February 28, 1992, letter that he had reviewed the veteran's medical chart from October 13, 1982, through November 11, 1982, and had attempted to answer questions she had posed to him concerning the effect of the veteran's kidney condition on his heart. R. at 874–75. She testified that he had responded "possibly" in response to her question whether patients with renal diseases are more susceptible to infections; that he had stated that "renal disease can affect the heart"; and that he had stated "possibly" in response to the question whether "patients who have renal, kidney disease[ ] as it progresses have dis[t]en[t]ion of the abdomen" such as the veteran had while hospitalized at the Loma Linda VAMC. She also stated that he had said that an "abdominal CAT SCAN was ordered to evaluate [the veteran's] condition and we were awaiting for it to be scheduled" and that he had answered "possibly" in response to the question whether renal insufficiency problems or drugs had caused the veteran "to get an electrolyte imbalance while he was hospitalized at Loma Linda Hospital". R. at 874–79. Apparently reading from his letter, she testified that Dr. Lu had stated: "In my opinion, his renal insufficiency may have been a contributory factor in his overall medical condition." R. at 879. This letter is not in the ROA, nor is there any indication that the hearing officer suggested to the appellant that she provide it.

Regarding her application for burial benefits, she testified that she had mailed the claim to the RO in February 1983, and did not find out until 1986 or 1987 that VA had

not paid the mortuary. R. at 903–04. In April 1992, the hearing officer denied an effective date earlier than May 1, 1988, for § 1151 DIC, denied burial benefits, and denied reopening as to the claims for § 1310 DIC and accrued benefits for TDIU. R. at 913. (Section 351 of title 38, U.S.Code, was redesignated as section 1151 by Pub.L. No. 102–83, § 5(a), 105 Stat. 378, 406 (1991).) In August 1993, the appellant submitted to the Board a letter stating that the veteran's cause of death had been due to a war injury to the left kidney and that she wanted the Board to rule on the claim to have this condition service connected "at the same time other issues" were decided. R. at 915. Her letter enclosed a copy of a February 9, 1993, "Addendum to Autopsy Protocol" prepared by Dr. Sheridan of the San Bernardino County Coroner's office. R. at 916. The addendum stated that the "autopsy protocol and the microscopic slides from this case" as well as "photocopies of some medical records and related documents sent by [the appellant]" had been reviewed. R. at 916. He stated that he agreed with the findings described in the autopsy protocol and that the description of the left kidney was also correct. *Ibid.* He noted that the "kidney is markedly abnormal histologically with extensive cortical scarring and destruction of glomeruli with severe resultant tubular atrophy." He also noted:

> There is marked thickening of the walls of the intraparenchymal arteries and arterioles in this kidney. The right kidney is entirely normal. These findings are consistent with severe injury to this kidney such as the subject suffered during World War II from a firearm injury. The severity of the injury to the left kidney is such that one would expect the patient to develop renal hypertension. Hypertension is a major risk factor for atherosclerosis. In addition, the cardiac hypertrophy due to the hypertension would have the effect of exacerbating the cardiac ischemia.

> Based on the above, it is this reviewer's opinion that the injury to the left kidney sustained during World War II ultimately led to the [veteran's] death.

R. at 916.

Based upon the submission of Dr. Sheridan's report, the Board requested "a medical opinion from a VA medical adviser as to whether there is a causal relationship between the 'kidney disorder' resulting from World War II service and the veteran's death in 1982." R. at 13. A medical opinion was then submitted by Dr. William O. Bailey, Jr., identified as "Medical Adviser", in August 1993. He noted that he had reviewed Dr. Sheridan's addendum to the autopsy protocol; summarized the veteran's service and postservice medical records; and cited to two medical treatises, Friedwald, W T., *Epidemiology of Cardiovascular Disease, in* CECIL TEXTBOOK OF MEDICINE 153–54 (19th ed. 1992), on the risk factors for arteriosclerosis, and the NATIONAL INSTITUTE OF HEALTH, PUB. No. 93–1088, NATIONAL HIGH BLOOD PRESSURE EDUCATION PROGRAM (1993), on the classification of blood pressure for adults. R. at 919–23. He concluded: "The evidence does not show that the veteran had arterial hypertension. It does not show that he had a cardiac condition or arteriosclerosis during or within one year after service or that his death was due to any service-connected condition." R. at 924. He did not respond to the Board's question about the relationship between the kidney disorder and the veteran's death. *See* R. at 919–24.

In the July 1, 1994, BVA decision here on appeal, the Board denied: (1) Reopening as to the accrued-benefits TDIU claim; (2) § 1310 DIC after having reopened as to that claim; (3) entitlement to burial benefits; and (4) entitlement to an effective date earlier than May 1, 1988, for the award of § 1151 DIC. R. at 4, 16–17. On April 25, 1995, the parties presented oral arguments before the Court. Pursuant to the Court's directive issued during oral argument, the parties submitted a joint stipulation certifying that Dr. Bailey was a BVA medical adviser at the time he rendered his August 25, 1993, opinion. Subsequently, the parties also submitted supplemental memoranda on several issues identified by the Court during and following oral argument.

## II. Analysis

### A. Accrued Benefits based on TDIU

The appellant's accrued-benefits claim currently on appeal is based on the veteran's

claim for entitlement to TDIU. As to the veteran's kidney condition, the Board stated in its July 1994 decision:

> The record shows that the veteran sustained [an SFW] injury to the kidney during service and that *the veteran should have been service connected for this injury at the time of his death.* In considering the claim for service connection for cause of the veteran's death in this appeal, the Board will consider the kidney condition to be service connected. However, with respect to the appellant's claim for payment of compensation for this disability, we note that neither the appellant's standing nor her eligibility for or entitlement to such benefits has been considered by the RO. Accordingly, this potential issue, *which is not inextricably intertwined with any issue in the current appeal,* is referred to the RO for any necessary action.

R. at 5–6 (emphasis added). The Board proceeded to find that new and material evidence had not been submitted since the time of the Board's December 1987 decision disallowing the claim for accrued benefits based on TDIU, and denied reopening. R. at 11. The Board noted the veteran's service-connected disabilities but did not mention his kidney condition as one of them for purposes of the TDIU claim. R. at 10.

██ The appellant contends that the Board should have assumed service connection for the kidney condition in evaluating the claim for accrued benefits based on TDIU and that the veteran's entire medical history "has to be reconsidered in light of the service-connected kidney injury." Br. at 8. The Secretary concedes that the Board's decision denying this claim should be vacated and the matter remanded for readjudication "in light of the veteran's newly service-connected kidney condition". Brief (Br.) at 35. He states: "Since the additional service-connected disability may constitute new and material evidence deemed to have been in the file at the date of death, a remand ... is required." Br. at 35–36. The Court agrees. Accordingly, the Court will remand the accrued-benefits claim for readjudication in light of the kidney condition. Also, contrary to the conclusion of the Board, whether the veteran is service connected for a kidney condition *is* inextricably intertwined with the TDIU claim in this case because at the time of his death the veteran's service-connected disabilities did not have a combined rating of 70% or more (*see* R. at 324–28), which, pursuant to 38 C.F.R. § 4.16(a) (1996), is the minimum percentage requirement that must be met before TDIU may be awarded when there are two or more disabilities, and because the rating to be assigned for the kidney condition may result in a combined rating that exceeds the stated percentage requirement. *See Babchak v. Principi,* 3 Vet.App. 466, 467 (1992) (remanding PTSD increasedrating claim and then also remanding TDIU claim on grounds that TDIU claim was inextricably intertwined with degree of impairment ultimately adjudicated for PTSD); *Begin v. Derwinski,* 3 Vet.App. 257, 258 (1992) (same). The Court notes that the appellant states in her brief that the RO, subsequent to the Board's July 1994 decision, granted service connection for the veteran's kidney disease in September 1994. Br. at 7. (The ROA does not include that decision because it was issued after the July 1994 Board decision here on appeal.)

### B. Burial Benefits

██ The appellant contends that she filed a timely application for burial benefits in February 1983 and that she had not received notification of VA's letter requesting further information, specifically, receipts for funeral expenses. The Secretary asserts that the appellant abandoned her claim for non-service-connected burial benefits because she failed to respond to VA's request for further information in support of her application. The Secretary concedes that, because the veteran died in a VA facility, the Board should have considered entitlement to burial benefits under 38 U.S.C. § 2303(a) and that its failure to do so warrants a remand for adjudication under that section.

*1. Death in VA facility.* The Court will remand the claim so the Board can apply section 2303(a), which provides for the payment of burial and funeral expenses "[w]hen

a veteran dies in a Department facility ... to which the deceased was properly admitted for hospital ... care". It is unclear what type of time limitation, if any, applies to this section. The Board will address these matters on remand.

### 2. Non-service-connected benefits.

If the Board does not award benefits under section 2303(a), then on remand the Board must decide whether the appellant is entitled to non-service-connected burial benefits pursuant to sections 2302 and 2304. Section 2302 provides for burial and funeral expenses in the case of a deceased veteran "who at the time of death was in receipt of compensation", and section 2304 requires that such an application under section 2302 "must be filed within two years after the burial of the veteran". 38 U.S.C. §§ 2302, 2304; see also 38 C.F.R. § 3.1601(a) (1996). With respect to supporting evidence, VA regulations provide: "Evidence required to complete a claim for the burial allowance ..., when payable, (including a reopened claim filed within the 2–year period) must be submitted within 1 year from date of [VA's] request for such evidence." 38 C.F.R. § 3.1601(b) (1996). The claimant is required to submit the statement of account and receipted bills. 38 C.F.R. § 3.1601(b)(1),(2). In the present case, the Board found that "the appellant failed to comply with [VA's] request for additional evidence in a timely manner" and that therefore she was not entitled to benefits under 38 U.S.C. § 2304 and 38 C.F.R. § 3.1601(b). R. at 14–15. It is undisputed that the veteran was in receipt of compensation at his death. The issue in dispute is whether the appellant submitted a timely application.

The veteran died on November 11, 1982. R. at 367. The ROA reflects that in January 1983 the appellant filed an application for non-service-connected burial benefits attaching copies of her marriage certificate and the veteran's death certificate. R. at 375, 377–79. A February 1983 RO letter to the appellant informed her that further information, including a "receipted funeral bill", was needed to process her claim. R. at 382. The appellant did not respond to this letter within two years after the veteran's death; however, in August 1986 she inquired as to the status of her claim. See R. at 433. That same month, the RO responded: "Our records indicate that your claim for [b]urial benefits was denied as you did not provide the requested [b]urial receipts requested in 1983. You had two years in which to file." R. at 433.

This Court has held that there is a "presumption of regularity", as applied to the mailing of BVA decisions pursuant to 38 U.S.C. § 7104(e), that "'the Secretary and the BVA properly discharged [their] official duties by mailing a copy of a BVA decision to the claimant and [to] the claimant's representative, if any, on the date the decision is issued', and that that presumption can be overcome only by 'clear evidence to the contrary'". Davis v. Brown, 7 Vet.App. 298, 300 (1994) (quoting Ashley v. Derwinski, 2 Vet.App. 307, 308–09 (1992)); see Morris v. Sullivan, 897 F.2d 553, 560 (D.C.Cir.1990) (quoting United States v. Chemical Foundation, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926), to the effect that "[t]he presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties").

In Chute v. Derwinski, the Court held that although an assertion by a claimant of nonreceipt of a BVA decision was insufficient by itself to rebut the presumption of regularity, such an assertion together with the submission of evidence of having made inquiries to VA after the decision had been mailed and the lack of evidence from VA of having mailed the decision rebutted such presumption. Chute v. Derwinski, 1 Vet.App. 352, 353 (1991) (per curiam order). In this case, the issue will be remanded for the Board to decide whether the 1983 claim for non-service-connected burial benefits under section 2302 was still open by virtue of the appellant's assertion that she did not receive the RO's February 1983 letter and of her August 1986 letter inquiring as to the status of her claim, as well as by virtue of the extent to which she has assiduously pursued her rights and responded promptly to other deadlines and VA communications and the lack of any indication in the ROA to suggest that her

veracity was ever disputed by the RO or the BVA.

**■ 3. Service-connected benefits:** The Board found that because service connection has not been granted for the cause of the veteran's death, there is no basis for entitlement to service-connected burial benefits under 38 U.S.C. § 2307. A veteran must die "as the result of a service-connected disability or disabilities" in order for the Secretary to be required to pay burial and funeral expenses under section 2307. In his brief, the Secretary acknowledges that if the Court decides to remand the claim for service connection for the cause of the veteran's death, "the service-connected burial[-]benefits issue should also be remanded ... since it is inextricably intertwined with the former issue." Br. at 34. As discussed in part II.D.2., below, the Court holds that there was no new and material evidence to reopen as to the appellant's § 1310 DIC claim. Accordingly, the Court will affirm the Board's finding that there is no basis for entitlement to service-connected burial benefits under section 2307.

### C. Earlier Effective Date for § 1151 DIC Award

**■** The appellant contends that she is entitled to an effective date earlier than May 1, 1988, with respect to the award of § 1151 DIC because VA had constructive notice of the "critical medical report" dated January 1986 at the time of the December 1987 Board decision denying her original DIC claim. She states that because she originally filed her DIC claim in 1983 and because her federal tort claim had been settled before the Board's December 1986 remand and before the Board's December 1987 decision, the award should be effective from 1983. The appellant's second basis for asserting entitlement to an earlier effective date is that the December 1987 Board decision relying on 38 C.F.R. § 3.358(c)(3) in denying her claim should be invalidated by a retroactive application of the Supreme Court's decision in *Brown v. Gardner*, where the Supreme Court invalidated that regulation. Br. at 19; *Brown v. Gardner*, 513 U.S. 115, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994), *aff'g* 5 F.3d 1456

(Fed.Cir.1993), *aff'g Gardner v. Derwinski*, 1 Vet.App. 584, 586–88 (1991).

The appellant has tried valiantly to convince the Court that this claim for an earlier effective date is not a claim based on clear and unmistakable error (CUE) under 38 C.F.R. § 3.105(a) (1996); however, the Court is not persuaded. The appellant contends that the Board's omitting consideration of the 1986 medical report despite the facts that the report (1) was prepared for VA use in the federal tort case, (2) was used in promoting settlement of that case, and (3) was in VA's control prior to the Board's December 1987 decision "goes beyond failure of [the] duty to assist" and that "[e]quity demands that VA be held accountable for knowledge of the contents of the report." Br. at 16–17. Essentially, the appellant is arguing that the Board did not consider all the evidence then of record when it decided her § 1151 DIC claim in 1987.

Pursuant to this Court's decision in *Mason v. Brown*, on the facts of this case the appellant could receive an earlier effective date only if there were CUE in a final RO decision or if one of the prior RO decisions were not final. *Mason v. Brown*, 8 Vet.App. 44, 51 (1995). However one phrases the appellant's contention here, it is still a CUE claim. She is claiming that the Board, in its prior decision, erred in failing to consider evidence of record (assuming the "critical" report is "of record" under *Bell v. Derwinski*, 2 Vet.App. 611, 612–13 (1992) (per curiam order)) and in applying an invalid regulation. Even assuming that the "critical" report was then "of record" and that *Gardner*'s holding invalidating § 3.358(c)(3) applies retroactively, the appellant is not entitled to relief under CUE because a CUE challenge cannot be made to a prior final decision of the Board. *See Smith (William) v. Brown*, 35 F.3d 1516, 1521 (Fed.Cir.1994) (claim of CUE is collateral attack on final decision of agency of original jurisdiction (AOJ), generally RO). Nor can a CUE claim be raised as to the prior December 1983 and February 1985 final RO decisions because they were "subsumed" within the Board's December 1987 decision. *Talbert v. Brown*, 7 Vet.App. 352, 355 (1995) (citing 38 C.F.R. § 20.1104 (1995)

(when determination of AOJ is affirmed by BVA, such determination is subsumed by final appellate decision)); *see also Yoma v. Brown*, 8 Vet.App. 298, 299 (1995) (per curiam order) (concluding that Court's decision vacating BVA decision has legal effect of nullifying previous underlying merits adjudication by AOJ (RO) because RO decision was subsumed in BVA decision). The Supreme Court's decision in *Gardner* did not *sub silentio* extend this Court's jurisdiction to allow it to review prior final Board decisions not otherwise subject to review in this Court. Because the error asserted by the appellant is contained in the Board's December 1987 decision (not the decision on appeal to this Court), the appellant can challenge that Board decision, in a way that might be subject to this Court's review, only on the basis of CUE, and the Federal Circuit's decision in *Smith* is controlling in precluding this Court from reviewing that decision. *See Talbert, supra.*

The appellant's contention that the Board's December 1987 decision was the result of "obvious error" is also unavailing. "In *Smith*, the Federal Circuit equated 'obvious error' claims with claims of 'clear and unmistakable error' and held that claims of such [obvious] error by the Board are not subject to judicial review." *Chisem v. Brown*, 8 Vet. App. 374 (1995); *see also Russell v. Principi*, 3 Vet.App. 310, 314 (1992) (en banc) (also equating claims of CUE with obvious-error claims). The Court holds that it has no jurisdiction to review the prior final December 1987 Board decision in this case. Accordingly, the Board's July 1994 decision as to this claim will be affirmed. *See* 38 C.F.R. § 3.400 (1995) (effective date of claim to reopen "will be the date of receipt of the claim or the date entitlement arose, whichever is *later*") (emphasis added).

The Court notes that the appellant is not precluded from seeking equitable relief from the Secretary under 38 U.S.C. § 503(a) or from seeking reconsideration of the Board's December 1987 decision. *See* 38 U.S.C. § 503(a) (if Secretary determines that benefits have not been provided because of administrative error, "the Secretary may provide such relief on account of such error as the Secretary determines equitable"); *Darrow v. Derwinski*, 2 Vet.App. 303, 305–06 (1992) (section 503(a) authorizes Secretary to grant relief that is equitable in nature and is separate and distinct from Secretary's authority to determine entitlement to benefits under the law; Secretary's denial of relief under section 503(a) not subject to judicial review). However, this Court is not a court of equity and cannot provide equitable relief. *See Harvey v. Brown*, 6 Vet.App. 416, 425 (1994).

### D. § 1310 DIC Claim Based on Death from Service–Connected Disability

The appellant contends that she was not given the opportunity, in violation of this Court's opinions in *Thurber v. Brown*, 5 Vet. App. 119 (1993), and *Austin v. Brown*, 6 Vet.App. 547 (1994), to respond to Dr. Bailey's medical report and that a remand is required for that reason. The Secretary concedes that the Board committed an *Austin* error but contends that it was not prejudicial to the appellant because there is a plausible basis in the record for the Board's decision without the Board medical adviser's opinion (BMAO). The Secretary contends that the evidence shows that the veteran did not have hypertension and that hypertension was not included in the autopsy report as a cause of death. Alternatively, he asserts that if the Court finds no plausible basis for the Board's decision without consideration of the BMAO, then a remand is in order.

▆▆▆▆ 1. **Austin** *error.* In *Thurber*, the Court held that before the BVA may rely on any evidence developed or obtained by it subsequent to the issuance of the most recent Statement of the Case (SOC) or Supplemental SOC (SSOC), the BVA must provide the claimant with reasonable notice of such evidence and of the reliance that the Board proposes to place on it and must provide a reasonable opportunity for the claimant to respond to it. *Thurber*, 5 Vet.App. at 126. Thereafter, in *Austin*, the Court expanded upon *Thurber* and held that a BVA decision must be set aside where, at least in part, it "rests upon a medical opinion procured by a process that violates both the express holding of *Thurber, supra*, and the fair process

principle underlying *Thurber.*" *Austin,* 6 Vet.App. at 551. The Court further expounded in *Austin* that a claimant's reasonable opportunity to respond "was not limited to argument or comment, but also included the claimant's right to submit additional evidence." *Ibid.* Finally, in *Austin* the Court raised substantial questions about the process by which the policy of seeking BMAOs in general was adopted by the BVA Chairman and required that the Board, if BMAOs were to be used, address these questions, by either complying with certain regulations (e.g., 38 C.F.R. §§ 19.9, 20.903 (1996)) or providing reasons or bases explaining why such compliance was unnecessary. *Austin,* 6 Vet.App. at 553–54; *see also Williams (Margie) v. Brown,* 8 Vet.App. 133, 137 (1995).

■ In the instant case, the Secretary concedes (Br. at 33) that the Court's decision in *Austin* applies to the present case under *Karnas v. Derwinski,* 1 Vet.App. 308, 312–13 (1991) ("where the law or regulation changes after a claim has been filed or reopened but before the administrative or judicial appeal process has been concluded, the version most favorable to appellant should ... apply unless Congress provided otherwise or permitted the Secretary ... to do otherwise and the Secretary did so"). He is correct. *See Williams,* 8 Vet.App. at 136–38. As the Secretary also concedes (Br. at 26), the *Austin* requirement was violated in this case insofar as the record contains no indication that the claimant was expressly informed, directly or though her counsel, that she could submit additional evidence in response to Dr. Bailey's August 1993 BMAO. That opinion was obtained after the issuance of the October 1991 SSOC (R. at 838), and the appellant was not thereafter afforded an opportunity to respond or to submit additional evidence. *See Williams,* 8 Vet.App. at 138. Moreover, even if such an opportunity had been provided, the very use of the BMAO by the Board without a discussion of compliance with applicable regulations would have raised the same questions raised in *Austin* and *Williams* about the process by which the BMAO was obtained and used.

■ However, the *Austin* violation can result in an unfair adjudication and a remand

only if the Court determines that the denial of the § 1310 DIC claim was properly reopened by the Board. *See Edenfield v. Brown,* 8 Vet.App. 384, 390–91 (1995) (en banc) (holding that, because appellant had failed to submit well-grounded claim, Board's failure to comply with fair-process requirements enunciated in *Thurber,* 5 Vet.App. at 126, was not prejudicial); *White (Frank) v. Brown,* 6 Vet.App. 247, 252 (1994) (concluding that where there was no new and material evidence and claim should not have been reopened, *Thurber* error was not prejudicial and did not require remand).

■ ***2. New and material evidence.*** Under the applicable law, the Secretary must reopen a prior final disallowance of a claim when "new and material evidence" is presented or secured with respect to the basis for the disallowance of that claim. *See* 38 U.S.C. §§ 5108, 7104(b), 7105(c). On a claim to reopen, a "two-step analysis" must be conducted under section 5108. *Manio v. Derwinski,* 1 Vet.App. 140, 145 (1991). The first step involves a determination as to whether the evidence presented or secured since the last final disallowance of the claim is new and material. *See Blackburn v. Brown,* 8 Vet.App. 97, 102 (1995); *Cox v. Brown,* 5 Vet.App. 95, 98 (1993); *Colvin v. Derwinski,* 1 Vet.App. 171, 174 (1991).

In *Evans v. Brown,* the Court has broken down this first *Manio* step into a three-question inquiry: The first question is whether the newly presented evidence is actually "new" in the sense that it was not of record at the time of the last final disallowance (on any basis—merits or otherwise) of the claim and not merely cumulative of other evidence that was then of record. *Evans v. Brown,* 9 Vet.App. 273, 283 (1996). The second question is whether the "new" evidence is probative of (tends to prove) the "issue[s] at hand" (each issue that was a specified basis for the last final disallowance of the claim). *Ibid.* The third question is whether, if the evidence is new and probative, then, in light of all of the evidence of record, there is a reasonable possibility that the outcome of the claim on the merits would be changed. *Ibid.* Affirmative answers to both materiality questions are required in order for "new"

evidence to be "material". *Ibid.* As to those two "materiality" components, the credibility of the newly presented evidence is generally presumed. *Justus v. Principi*, 3 Vet.App. 510, 513 (1992). Also, in looking at the first materiality component (whether the evidence found to be "new" is also probative), "the focus is on the new evidence; as to the second materiality component (whether there is a reasonable possibility that the outcome on the merits would be changed), the focus is on *all* of the evidence of record rather than just on the new evidence." *Evans*, 9 Vet. App. at 283.

■ If the evidence satisfies the three *Evans* questions and is thus new and material, then the second step of the *Manio* two-step process applies. The Board must then reopen the claim and "review the former disposition of the claim", 38 U.S.C. § 5108— that is, review all the evidence of record to determine the outcome of the claim on the merits. *See Manio, supra; Jones (McArthur) v. Derwinski*, 1 Vet.App. 210, 215 (1991). A Board determination as to whether evidence is "new and material" for purposes of reopening is a question of law subject to de novo review by this Court under 38 U.S.C. § 7261(a)(1). *See Masors v. Derwinski*, 2 Vet.App. 181, 185 (1992); *Jones*, 1 Vet.App. at 213; *Colvin, supra.*

In this case, the Board found that evidence submitted since the April 1983 final RO decision denying § 1310 DIC was new and material (specifically, Dr. Sheridan's February 1993 medical report) but denied the DIC claim on the merits. R. at 7. The last final disallowance of this claim was the April 1983 RO decision. R. at 392; *see Evans, supra.* Subsequent to April 1983, the appellant submitted Dr. Sheridan's February 1993 report. R. at 916. That medical report was "new" because it provided evidence that was not cumulative of any already in the file. *See Evans, supra; Struck v. Brown*, 9 Vet.App. 145, 151 (1996); *Colvin, supra.*

The next question is whether that evidence was probative of the issue at hand. *See Evans, supra.* The RO's April 1983 disallowance was based on a lack of evidence showing that the veteran had had heart disease in service or within the presumption period or showing that his service-connected disabilities contributed to his death. R. at 392. Dr. Sheridan opined that the findings from the autopsy "are consistent with severe injury to this kidney such as the subject suffered during World War II from a firearm injury". He further stated: "The severity of the injury to the left kidney is such that one would expect the patient to develop renal hypertension. Hypertension is a major risk factor for atherosclerosis. In addition, the cardiac hypertrophy due to the hypertension would have the effect of exacerbating the cardiac ischemia." He concluded that, based on this analysis, "the injury to the left kidney sustained during World War II ultimately led to the [veteran's] death." R. at 916. This evidence tends to show that the veteran's kidney condition is related to service (of course, the Board has already conceded that connection, and the RO has apparently awarded service connection therefor) and that this condition led to the veteran's death. *See Evans, supra.* Hence, because "the focus is on the new evidence", *Evans*, 9 Vet.App. at 283, for purposes of determining whether new evidence is probative, Dr. Sheridan's report is probative. However, that is not sufficient to make it "material".

■ In order for probative evidence to be "material", that evidence, when reviewed in light of all the evidence of record, must create a reasonable possibility of changing the outcome. *See Evans, supra.* For purposes of making that determination, "the focus is on *all* of the evidence of record rather than just on the new evidence." *Evans, supra.* Dr. Sheridan's report stated merely that the veteran was *expected* to develop hypertension. As the Board put it, Dr. Sheridan found that "the veteran's kidney disease *could cause* hypertension", and Dr. Sheridan's conclusion was based entirely on his hypothesis as to the veteran's having suffered from hypertension. R. at 13. The Board specifically found that the "argument that the veteran's kidney injury caused hypertension, which caused the veteran's death[,] is not supported by the evidence of record as hypertension is not shown." R. at 14. The Court holds that there is a plausible basis for the Board's finding; the record is

devoid of any diagnosis of hypertension or medical opinion that the veteran had had hypertension. Accordingly, the Court holds that, even presuming the credibility of Dr. Sheridan's opinion under *Evans* and *Justus*, both *supra*, in the context of the other evidence of record there is not a reasonable possibility that Dr. Sheridan's statement could change the outcome of the claim on the merits. *See Evans, supra.* In reaching this conclusion, the Court has not given any consideration to the conclusion by Dr. Bailey that the veteran did not have "arterial hypertension" because, as discussed in part II.D.1., above, that BMAO was obtained in violation of this Court's opinions in *Thurber* and *Austin*, both *infra*, and thus is not for consideration in making this assessment as to the materiality of Dr. Sheridan's opinion. *See Bielby v. Brown*, 7 Vet.App. 260, 264–69 (1994) (in determining whether evidence was new and material, Court did not discuss independent medical examination report that was held to be obtained through "questionable" process).

The Court's holding that there was no new and material evidence to reopen as to the § 1310 DIC claim does not, of course, preclude the appellant from seeking to reopen as to that claim by submitting new medical evidence—either from Dr. Sheridan or elsewhere—that the veteran did in fact have hypertension or that the veteran's now service-connected kidney disease otherwise contributed to his death in such fashion as to make his death service connected. *See* 38 U.S.C. §§ 5108, 7104(b). The appellant is also not precluded, if successful in obtaining service connection for the cause of the veteran's death, from seeking service-connected burial benefits under 38 U.S.C. § 2307.

**▪ 3. *Hearing officer duty.*** At the March 1992 hearing, the appellant read from a February 1992 letter from Dr. Lu opining that "renal insufficiency may have been a contributing factor in [the veteran's] overall medical condition". R. at 879. Although the hearing officer did not inform the appellant—and probably should have done so—that she should submit Dr. Lu's statement (*see* 38 C.F.R. § 3.103(c)(2) (1996) (VA hearing personnel must "suggest the submission of evidence which the claimant may have overlooked and which would be of advantage to the claimant's position")), the Court concludes that the opinion of Dr. Lu on the question of whether kidney disease contributed to the veteran's overall medical condition is so speculative ("may have") and so generalized as to death (it does not express an opinion as to a nexus between the kidney disorder and the veteran's *death*) that even if what the appellant testified Dr. Lu had written were actually in the record as direct evidence from Dr. Lu, such medical evidence would have been too speculative to have made a difference on the question of whether there was new and material evidence to reopen as to the claim for service connection of the veteran's death. *See* 38 U.S.C. § 7261(b); *Edenfield*, 8 Vet.App. at 390–91 (as to nonprejudicial error); *see also Dean v. Brown*, 8 Vet.App. 449, 455 (1995) (concluding that even if physician's statement were of record, it would be insufficient to render claim well grounded "because it would be an opinion only as to the likelihood of the veteran's subsequently developing Huntington's chorea, not an opinion that the disability had its onset in, was aggravated by, or would otherwise be related to the appellant's condition in service"); *Johnson (Ethel) v. Brown*, 8 Vet.App. 423, 427–28 (1995) (holding that hearing officer had no obligation under 38 C.F.R. § 3.103(c)(2) to advise appellant as to physician's statement because "that statement would not have helped prove the claim"—that is, that statement would not have "provide[d] a nexus with the veteran's service").

## III. Conclusion

Upon consideration of the record and the submissions of the parties and in accordance with the foregoing discussion, the Court affirms the July 1, 1994, BVA decision as to the § 1310 DIC claim, the denial of burial benefits under 38 U.S.C. § 2307, and an effective date earlier than May 1, 1988, for § 1151 DIC, and vacates the decision and remands the matters of accrued benefits based on TDIU and burial benefits under 38 U.S.C. §§ 2302, 2303(a), and 2304 for expeditious further development and readjudication, on the basis of all applicable law, regulation, and

procedure, and issuance of a readjudicated decision supported by an adequate statement of reasons or bases, *see* 38 U.S.C. §§ 2302, 2303(a), 2304, 5107(a), (b), 5108, 7104(a), (d)(1), 7105(c), 7261; *Fletcher v. Derwinski,* 1 Vet.App. 394, 397 (1991)—all consistent with this opinion and in accordance with section 302 of the Veterans' Benefits Improvements Act, Pub.L. No. 103–446, § 302, 108 Stat. 4645, 4658 (1994) (found at 38 U.S.C. § 5101 note) (requiring Secretary to provide for "expeditious treatment" for claims remanded by BVA or Court). *See Allday v. Brown,* 7 Vet.App. 517, 533–34 (1995). "On remand, the appellant will be free to submit additional evidence and argument" on the remanded claims. *Quarles v. Derwinski,* 3 Vet.App. 129, 141 (1992). A final decision by the Board following the remand herein ordered will constitute a new decision that, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board final decision is mailed to the appellant.

AFFIRMED IN PART; VACATED and REMANDED IN PART.